UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BERNARD PERRY,

               Plaintiff,

          v.

HAL ANTILLEN NV, et al.,

               Defendants.

CASE NO. C12-0850JLR

ORDER REGARDING PARTIES'
MOTIONS FOR SUMMARY
JUDGMENT

## I.   INTRODUCTION

Before the court are three overlapping motions:  (1) Plaintiff Bernard Perry's

motion for partial summary judgment (Plt. Mot. (Dkt. # 37)), (2) Defendants Rain Forest

Aerial Tram, Ltd., Elite Shore Excursions Foundation, and Rain Forest Adventures's

(collectively, "RFT/Elite") motion for summary judgment (RFT Mot. (Dkt. # 56)),[1] and

---

[1] RFT/Elite's motion for summary judgment is 26 pages long.  (*See* RFT Mot.)  Local
Rule LCR 7(e)(3) states that "[m]otions for summary judgment . . . shall not exceed twenty-four
pages."  Local Rules W.D. Wash. LCR 7(e)(3).  Even if the court excludes the caption and

(3) Defendants HAL Antillen N.V., Holland America Line N.V., Holland America Line, Inc., and Holland American Line-USA, Inc.'s (collectively "HAL") motion for summary judgment (HAL Mot. (Dkt. # 61)).

Mr. Perry brings this action both individually and in his capacity as the executor of the estate of his deceased wife, Jane Perry.  (2d Am. Compl. (Dkt. # 52) at 1.)  Mr. Perry alleges claims arising out of an accident that occurred when he and his wife returned from a shore excursion while they were on a "Grand World Tour" cruise with the vessel, the Amsterdam.  (*See generally id.* ¶¶ 3.1-3.32.)  Mr. Perry's action involves claims against HAL, which sold and operated the 2012 "Grand World Tour" cruise, as well as RFT/Elite,[2] which owned and operated a shore excursion located at the Port of Roseay, Dominica, advertised as the Rain Forest Aerial Tram ("the Dominica Aerial Tram").  (*Id.* ¶¶ 1.2-1.7, 2.5, 3.1-3.2.)  Mr. Perry brings claims for (1) negligence and vicarious liability through joint venture against all of the defendants (*id.* ¶¶ 4.1-4.30), (2) breach of contract based on third-party beneficiary status against RFT/Elite (*id.* ¶¶ 4.44-4.56), and

---

signature block pursuant to Local Rule LCR 7(e)(6), RFT/Elite's motion still exceeds the page limitation.  *See id.* LCR 7(e)(6).  Accordingly, the court may refuse to consider any text outside of the page limitation.  *See id.*  In the future, the court expects RFT/Elite to strictly comply with its Local Rules.

[2] Holland America's Director of Shore Excursions, Ellen Lynch, has testified that it is Holland America's understanding "that Rain Forest Tram, Limited, Rain Forest Sky Rides, Limited, and Elite Shore Excursions are essentially one in the same" and that "[n]one of those entities ever sought to distinguish themselves from one another for purposes of their relationship with Holland America."  (3/18/13 Myers Decl. Ex. J (Lynch Dep.) at 25:9-16.)  Further, these three defendants describe themselves collectively as "RFT/Elite" and treat themselves as one entity for purposes of their summary judgment motion and in their opposition to the Perrys' motion for summary judgment.  (*See generally* RFT Motion; RFT Resp. (Dkt. # 40); RFT Reply (Dkt. # 72).)

(3) misleading advertising and violation of Washington's Consumer Protection Act ("CPA"), RCW ch. 19.86, against HAL (*id.* ¶¶ 4.31-4.43).

Mr. Perry seeks rulings from the court that (1) RFT/Elite is equitably estopped from denying that it owed a duty to Ms. Perry to provide her with safe ground transportation and that the minibus driver, Mr. Alwin Hill, was RFT/Elite's agent (*see* Plt. Mot. at 2, 8, 9-11),  (2) the Perrys are third-party beneficiaries of the contract between HAL and RFT/Elite (*see id.* at 2, 8, 11-13), and (3) RFT/Elite breached its obligations to the Perrys as third-party beneficiaries of that contract when RFT/Elite failed to disclose to HAL that Mr. Hill was a subcontractor and also failed to provide evidence that Mr. Hill possessed $2 million in liability insurance (*id.*).

RFT/Elite seeks dismissal on summary judgment of Mr. Perry's claim for negligence asserting that RFT/Elite did not owe a heightened duty of care or breach a duty of ordinary care to the Perrys at the time that the accident occurred (RFT Mot. at 10-17) and that Mr. Hill was not an employee of Elite, but rather an employee of non-party taxicab company, True Worshippers Services, Inc. ("True Worshippers") (*id.* at 18-19). RFT/Elite also seeks rulings that there is no joint venture between Elite and HAL (*id.* at 19-22), the Perrys are not third-party beneficiaries of the contract between HAL and RFT/Elite (*id.* at 22-24), and there is no evidence that RFT/Elite breached its contract with HAL (*id.* at 24-26).

Finally, HAL also seeks a variety of rulings on summary judgment.  (*See generally* HAL Mot.)  HAL seeks rulings that (1) it never operated a joint venture with RFT/Elite and is therefore not vicariously liable to the Perrys (*id.* at 8-10), (2) the Perrys'

1    personal injuries are not compensable under the CPA (*id.* at 10-11), (3) it did not make

2    any misrepresentations regarding passenger safety with respect to shore excursions (*id.* at

3    11-14), and (4) it was not negligent (*id.* at 14-24).

4        The court has considered all three motions, all submissions filed in response and

5    reply thereto, the balance of the record, and the applicable law.  The court heard the oral

6    argument of counsel on May 7, 2013.  Being fully advised, the court GRANTS in part

7    and DENIES in part each of the parties' motions.

8                    **II.    BACKGROUND**

9        **A.    The Accident**

10       After the Perrys purchased tickets for Holland America's 2012 "Grand World

11   Tour," HAL sent the Perrys a brochure entitled "Shore Excursions, 2012 Grand World

12   Tour."  (*See* 12/27/12 Perry Decl. (Dkt. # 39) ¶ 1; 3/18/13 Perry Decl. (Dkt. # 67) ¶ 1.)

13   The brochure indicates on its face that it is produced by "Holland America Line."  (*See*

14   12/27/12 Myers Decl. (Dkt. # 38) ¶ 6, Ex. 4 at 2; 3/18/13 Myers Decl. (Dkt. # 66) ¶ 4, Ex.

15   B at 13.)  The brochure promotes a variety of shore excursion tours related to the "2012

16   Grand World Voyage."  (*See id.*  Ex. B at 21-25.)

17       The Perrys identified interesting shore excursions and reserved tickets for the

18   Dominica Aerial Tram based on the information in the brochure, along with discussions

19   during telephone conversations with HAL personnel.  (12/27/12 Perry Decl. ¶ 2; 3/18/13

20   Perry Decl. ¶ 2.)  With respect to the Dominica Aerial Tram, the brochure states, in part,

21   "[y]our excursion takes you by coach through the city of Roseau to Laudat, a village

22   nestled more than 2,000 feet upon the mountains."  (*Id.*; 3/18/13 Myers Decl. (Dkt. # 66)

¶ 4, Ex. B at 13; *see also id.* Ex. D at 21.)  The Perrys selected the Dominica Aerial Tram

excursion "partly because it had been rated suitable for persons with some mobility

limitations."  (3/18/13 Perry Decl. ¶ 3.)  Ms. Perry "was a very slow walker, due to

compromised knees."  (*Id.* ¶ 7.)

The shore excursion brochure and other promotional materials produced by HAL

extol the benefits of booking onshore tours with HAL rather than making independent

arrangements and imply that the tours are affiliated with HAL.  (*See* 12/27/12 Myers

Decl. Exs. 1, 2 ("Why book tours with Holland America Line versus making your own

arrangements ashore?"); 3/28/13 Myers Decl. (Dkt. # 76) Ex. 1 at 3 ("the benefits of

booking with us").)  Specifically, those promotional materials state, in part:  (1) "*Our*

tours offer a wide variety of activities with something for everyone," (2) "*We* use only

professional English-speaking independent tour guides," and (3) "Safety is of extreme

importance to us and *our* tour operators."  (*Id.* (italics added); *see also* 3/18/13 Myers

Decl. Ex. D at 23; 3/28/13 Myers Decl. Ex. 1 at 3.)  The promotional materials also state:

> We take steps to identify and contract with reputable tour operators.  Tour
> operators must comply with local government requirements and carry
> liability insurance in amounts consistent with local standards to address
> personal injury and property damage.

(12/27/12 Myers Decl. Ex. 2 at 3.)

Based on the Holland America's representations, the Perrys "expected that any

tour operator providing or assisting in providing the . . . [Dominica] Aerial Tram

excursion would be thoroughly vetted by Holland America" and "adhere to Holland

America's quality and safety standards and carry adequate liability insurance for any

1  damages . . . sustained while on the excursion." (12/27/12 Perry Decl. ¶ 3; 3/18/13 Perry

2  Decl. ¶ 4.)  Mr. Perry has testified that although no one expressly told him that HAL

3  operated the Dominica Aerial Tram, he was under the impression that it was operated by

4  HAL.  (3/28/13 Myers Decl. Ex. 3 (Perry Dep.) at 13:5-14:23.)

5       At the beginning of the Dominica Aerial Tram excursion, the Perrys were directed

6  to board a minibus driven by Alwin Hill.  (3/18/13 Perry Decl. ¶ 5.)  Mr. Perry has

7  testified that the minibus contained no signs indicating who owned or operated it.  (*Id.*)

8  Mr. Perry has testified that no one informed him or his wife which company would be

9  providing the Dominica Aerial Tram or the ground transportation that was included in the

10 tour.  (*Id.*)  He has also testified that Holland America did not tell him that the tram

11 company was a separate entity.  (2/26/13 McFetridge Decl. ¶ 7, Ex. E (Perry Dep.) at 43.)

12 Mr. Perry did not realize that the minibus was being provided by someone other than

13 Holland America or the tour operator.  (*See* 3/18/13 Perry Decl. ¶ 5.)  Indeed, Mr. Perry

14 has testified that he thought that the driver, Mr. Hill, was working for Holland America.

15 (2/26/13 McFetridge Decl. ¶ 7, Ex. E (Perry Dep.) at 43.)

16       After the tour, Mr. Hill dropped the Perrys off at the pier.  Mr. Perry has testified

17 that their drop-off point was "a considerable distance from the vessel gangway."

18 (3/18/13 Perry Decl. ¶ 6.)  Mr. Hill parked on the ship-side of the pier and assisted Mrs.

19 Perry out of the minibus.  (Hill Decl. (Dkt. # 58) ¶ 7; 2/26/13 McFetridge Decl. ¶ 7, Ex. E

20 (Perry Dep.) at 45:2-3.)  She was the last passenger out of the minibus.  (Hill Decl. ¶ 7.)

21 According to Mr. Hill's testimony, he inspected the minibus to see if any passengers had

22 left any personal items behind, talked to some local vendors, and signed out at

1   approximately 4:29 p.m.  (*Id.*)  He then returned to his minibus to head to another taxi

2   driving job.  (*Id.* ¶¶ 8-9.)  He began to do a U-turn to exit the pier when he felt a bump

3   near the left-passenger side of the vehicle.  (*Id.* at 8.)  He then placed the vehicle in

4   reverse and felt the minibus run over something.  (*Id.*)  He had in fact run over Mrs.

5   Perry's leg.  (*Id.*)  Mrs. Perry ultimately died of her injuries.[3]  (3/18/13 Perry Decl. ¶ 8.)

6          According to Mr. Perry's testimony, after he and his wife exited the minibus, he

7   began to take photographs of the cruise ship.  (2/26/13 McFetridge Decl. ¶ 7 Ex. E (Perry

8   Decl.) at 48:21-22, 49:25-50:5.)  Some of his photographs of the cruise ship contain an

9   electronic time stamp of 4:44 p.m.  (*Id.* at Ex. E at 51:16-18; *Id.* ¶ 8, Ex. F at 2-3.)  Other

10  skewed photos, which do not clearly depict anything, contain electronic time stamps of

11  4:54 p.m.  (*Id.* Ex. F at 4-5.)  While Mr. Perry was taking pictures of the cruise ship, Mr.

12  Hill struck Mrs. Perry with his minibus and ran over her leg.  (3/18/13 Perry Decl. ¶¶ 7-8;

13  Hill Decl. ¶ 8; 2/26/13 McFetridge Decl. ¶ 7, Ex. E (Perry Dep.) at 48:21-25; 61:22-25.)

14         RFT/Elite asserts that Mr. Hill had safely dropped the Perrys off at the pier, had

15  logged off his job for RFT/Elite, was on his way to another transportation job at the time

16  of the accident.  (2/26/13 McFetridge Decl. ¶ 10, Ex. H (RFT/Elite Rule 30(b)(6) Dep.) at

17  32:9-18.)  Indeed, RFT/Elite asserts that "[i]t is undisputed that the accident occurred

18  over 20 minutes after the Perrys were safely dropped-off on the pier."  (3/28/13 Myers

19  Decl. Ex. 6 (RFT/Elites's Resp. to Plf.'s RFAs) at 2.)  However, the only evidence that

20

21         [3] Mr. Perry states in his briefing that Mrs. Perry was airlifted to Yale New Haven
    Hospital in Connecticut on January 10, 2012, and ultimately succumbed to the injuries she
22  sustained in the accident on January 22, 2012.  (Plf. Mot. at 7-8.)

1    RFT/Elite cites in support of a more than 20 minute delay between the time the Perrys

2    were dropped off at the pier and the time of the accident are the skewed photographs

3    taken by Mr. Perry which bear a time stamp of 4:54 p.m., along with Mr. Perry's

4    deposition testimony that the accident occurred while he was taking photographs of the

5    cruise ship.  (*See* 2/26/13 McFetridge Decl. Ex. E (Perry Dep.) at 48:21-49:2, 49:25-50:5,

6    50:13-18, 51:6-18, 61:22-62:8; *id.* Ex. F at 4-5.)  Although Mr. Perry's testimony is clear

7    that he was taking photographs at the time of the accident, the court is unable to find

8    evidence in the record definitely establishing that the skewed photographs (time-stamped

9    at 4:54 p.m.) were shot either before or during the accident, as opposed to being

10   inadvertently taken by Mr. Perry after the accident occurred.  It is just as reasonable to

11   infer that it was the earlier photos that Mr. Perry shot (time-stamped at 4:44 p.m.) that

12   were taken at or near the moment of the accident.  Thus, the court cannot conclude that

13   "undisputed" evidence in the record establishes that Mrs. Perry's accident occurred over

14   20 minutes after the Perrys were dropped off at the pier.

15          RFT/Elite has admitted that it "was responsible for arranging for passengers to get

16   to and from the cruise ship and tour facility."  (3/28/13 Myers Decl. Ex. 6 at 2; *see also*

17   2/26/13 McFetridge Decl. Ex. I (Royer Dep.) at 12:23-14:1.)  Nevertheless, it is

18   undisputed that Mr. Hill was not an employee of RFT/Elite or HAL.  (3/28/13 Myers

19   Decl. Ex. 6 at 5 ("Alwin Hill is a Dominica taxicab driver, not an employee of Elite.");

20   Hill Decl. ¶ 3 ("I am not employed by Rain Forest Aerial Tram, LTD., Elite Shore

21   Excursions Foundation, Rain Forest Adventure, or Holland America.").)  Rather, on the

22   day of the accident, Mr. Hill was driving for True Worshippers. (2/26/13 Hill Decl. ¶¶ 3-

4; Joseph Decl. (Dkt. # 59) ¶ 3.)  True Worshippers is company that is a separate and

distinct from both RFT/Elite and from HAL.  (*Id.*; Royer Decl. (Dkt. # 60) ¶ 4.)  On the

day of Mrs. Perry's accident, RFT/Elite utilized the services of True Worshippers as an

independent contractor to provide transportation for HAL's guests or passengers to and

from the Dominica Tram.  (Royer Decl. (Dkt. # 60) ¶ 4; *see* 2/26/13 McFetridge Decl.

(Dkt. # 57) ¶ 10, Ex. H (Bratt Dep.) at 31-32; Joseph Decl. ¶ 3.)

HAL has utilized RFT/Elite as a shore excursion provider for ten years.  (3/14/13

Lynch Decl. (Dkt. # 64) ¶ 15.)  Over the course of those years, HAL has put RFT/Elite

through innumerable reviews of its various shore excursion tours and tracked RFT/Elite's

safety record.  (*Id.*)  In addition, over those years, thousands of HAL passengers have

taken RFT/Elite's tours.  (*Id.* ¶ 17.)  Prior to the accident involving Mrs. Perry, HAL had

no information revealing a history of complaints involving RFT/Elite or the Dominica

Aerial Tram excursion.  (*Id.* ¶¶ 22-24.)  Indeed, HAL also has no record that any guest

complained about any problems involving RFT/Elite or the Dominica Aerial Tram

excursion prior to Ms. Perry's accident.  (*Id.* ¶¶ 18, 22-25.)

### B.     TOPPS Contract

HAL issues a manual entitled, "Tour Operator Procedures and Policies"

("TOPPS").  (*See* 12/27/12 Myers Decl. ¶ 5, Ex. 3; 1/18/13 McFetridge Decl. (Dkt. # 47)

¶ 3, Ex. B.)  RFT/Elite executed a copy of TOPPS, and this document represents the

contractual agreement between RFT/Elite and HAL.  (*Id.*)  Section 2 of TOPPS is entitled

"Purpose of this Manual," and it states:

This manual provides important information regarding HAL's expectation of how our Tour Operators should conduct their shore excursions for our guests.  It includes useful guidelines as well as details about our Tour Program.

\*\*\*\*\*\*\*\*\*\*

By providing services for HAL and its guests, Tour Operators agree to all the requirements and conditions contained in this manual which are applicable to them.  Should Tour Operators be unable to comply with any of the items requested here, it is their responsibility to advise HAL immediately of their specific concerns.

(12/27/12 Myers Decl. Ex. 3 at 4; 1/18/13 McFetridge Decl. Ex. B at 4.)  Section 6, entitled "Safety and Security," states that "Tour Operators providing tours for HAL must deliver a product that is both safe and secure for HAL's guests."  (12/27/12 Myers Decl. Ex. 3 at 13; 1/18/13 McFetridge Decl. Ex. B at 13.)  Section 11, entitled "Invoicing and Payment," indicates that Tour Operators are being paid "for the valued services provided to HAL's guests."  (12/27/12 Myers Decl. Ex. 3 at 21; 1/18/13 McFetridge Decl. ¶ 3, Ex. B at 21.)[4]

Section four of TOPPS, entitled "Shore Excursion Information," specifically addresses and discusses how information is collected from Tour Operators for use in the shore excursion brochure that was produced by HAL and is at issue here:

***Tour Data Forms (TDFs)***
For each tour, a separate Tour Data Form . . . must be completed by the Tour Operator and provided to the Shore Excursion Department before the

---

[4] The entire sentence reads:  "In order to streamline the payment process to Operators for the valued services provided to HAL's guests, in most regions of the World we will be paying Operators electronically though the international banking system."  (12/27/12 Myers Decl. Ex. 3 at 21; 1/18/13 McFetridge Decl. ¶ 3, Ex. B at 21.)

ORDER - 10

tour can be marketed to our [HAL's] guests.  The Tour Data Form requests detailed information for each excursion. . . .

**********

***Shore Excursion Brochure and Website***
HAL's Shore Excursion Brochure and website contain descriptions and prices for each of the tours offered on a particular sailing.  The brochure is mailed to HAL guests along with their cruise tickets so they can learn about our tour program and purchase tours at their leisure. . . .

Guests use the website and brochure descriptions to determine what tours they will purchase.  It is imperative that the descriptions provided in the TDFs include all pertinent information that will help sell the excursions.  The Shore Excursion Department [of HAL] must be notified immediately of any changes in itineraries or schedules of the tours so that modifications are made to our tour descriptions on our website and in future brochures.  We [HAL] reserve the right to modify your tour descriptions at any time. . . .

(12/27/12 Myers Decl. Ex. 3 at 6-7; 1/18/13 McFetridge Decl. Ex. B at 6-7.)

With respect to advertising, section four of TOPPS also requires that all tour operator materials, such as "pens, banners, and clipboards," "should reflect HAL's name only."  (12/27/ Myers Decl. Ex. 3 at 9; 1/18/13 McFetridge Decl. Ex. B at 9.)

Section 12 of TOPPS, entitled "Liability and Insurance," states that a "Tour Operator is responsible for guests from the time they board the transportation provided by the Tour Operator at the start of the shore excursion until guests are safely returned to the ship at the end of the excursion."  (12/27/12 Myers Decl. Ex. 3 at 22; 1/18/13 McFetridge Decl. Ex. B at 22.)  With respect to insurance, TOPPS requires a tour operator in the Caribbean to obtain minimum limits of auto and general liability insurance of "US$2.0 million/accident or occurrence."  (*Id.*)  In addition, TOPPS requires that "[e]xcursions utilizing commercial buses, vans or motor coaches and which are subject to U.S.

ORDER - 11

Department of Transportation regulations must carry . . . 'minimum' commercial and/or

Business Auto Liability limits" of "US$2.0 million per accident or occurrence" if the

vehicle carries "15 passengers or less" or "US$5.0 million per accident or occurrence" if

the vehicle carries "16 passengers or more." (*Id.* Ex. B at 22.)

Section 12 of TOPPS further provides that "[s]hould the Operator subcontract for

services (such as aircraft, rail, tour buses or watercraft), the Tour Operator must provide a

list of its subcontractors and evidence of the subcontractor's insurance[, and] [t]he

subcontractor's insurance must also meet the above criteria." (12/27/12 Myers Decl. Ex.

3 at 26; 1/18/13 McFetridge Decl. Ex. B at 25.) HAL has stated that, pursuant to this

section of the contract, RFT/Elite was "required to provide a list to [HAL] of all

subcontractors used for excursion related services." (3/18/13 Myers Decl. Ex. F at 58.)

HAL has also stated that, pursuant to this same portion of the contract, RFT/Elite was

"required to assure that any subcontractor it used to provide excursion related services

had in place the equivalent of USD 2,000,000 in auto and general liability coverage."

(*Id.* at 59.) Likewise, HAL has acknowledged that RFT/Elite was required to obtain

$2,000,000.00 of general liability insurance, and that this insurance was "not just for the

excursion itself, but it would be for the associated ground transportation" as well.

(1/18/13 McFetridge Decl. Ex. F (HAL Rule 30(b)(6) Dep.) at 29:4-16.)

HAL has stated that RFT/Elite "was responsible [for] the ground transportation

services for Mrs. Perry in relation to the Dominica Aerial Tram excursion on January 9,

2012" (3/18/12 Myers Decl. Ex. F at 2), and RFT/Elite has admitted this (3/28/13 Myers

Decl. Ex. 6 at 2). Further, there is no dispute that RFT/Elite subcontracted with True

Worshippers to provide buses for ground transportation on the Dominica Aerial Tram

excursion on the day of Mrs. Perry's accident, and that Mr. Hill worked for True

Worshippers and was Mrs. Perry's driver on the day of her accident.  (*See* 3/18/13 Myers

Decl. (Dkt. # 66) ¶ 12, Ex. J (HAL Rule 30(b)(6) Dep.) at 28:19-22 ("Q:  Do you know

whether [RFT/Elite] subcontracted the ground transportation associated with the Perrys'

excursion . . . ?  A:  Yes, they did."); Royer Decl. ¶¶ 4, 5 ("[RFT/Elite] had to contact the

local taxi associations to procure transportation from the cruise ship docks to the

rainforest. . . . True Worshippers was advised that there would be 90 passengers that

would need transportation [on] . . . January 9, 2012 . . . ."); 2/26/13 McFetridge Decl.

¶ 11, Ex. I (Royer Dep.) at 19:20-20:20; *see also* Joesph Decl. ¶ 3 ("On January 9, 2012,

True Worshippers . . . provided some drivers, including Alwin Hill, to transport tourists

to the Aerial Tram Facility.").)

The testimony of RFT/Elite's Federal Rule of Civil Procedure 30(b)(6) deponent

is as follows:

> Q:  The bus companies that provide ground transportation to and from the
> tram facility are independent contractors?  Correct?
>
> A:  Correct.
>
> Q:  In fact, they're taxi services. Correct?
>
> A:  Correct.
>
> Q:  Can you tell me whether or not [RFT/Elite] used other taxi services in
> Dominica for transport to the aerial tram facility?
>
> A:  Yes.
>
> Q:  They used a number of different taxi services.  Correct?

A:  Correct.

**********

Q:  Okay.  Is it your understanding that Mr. Hill was a driver for a company called True Worshippers?

A:  I didn't know the name of the company, but, yes, I knew that he was one of our taxi providers.

(2/26/13 McFetridge Decl. ¶ 10, Ex. H (RFT/Elite Rule 30(b)(6) Dep.) at 31:14-32:8.) [5]

Nevertheless, according to HAL, RFT/Elite did not identify either Mr. Hill or True Worshippers as subcontractors with respect to the Dominica Aerial Tram excursion.  (*See* 3/18/13 Myers Decl. Ex. F at 3-4.)  Indeed, HAL apparently did not know about RFT/Elite's use of True Worshippers and Mr. Hill as contractors for ground transportation until after Ms. Perry's accident.  (*See* 3/18/13 Myers Decl. ¶ 12, Ex. J (Lynch Dep.) at 28.)  Further, although RFT/Elite obtained the required $2,000,000.00 per accident or occurrence in liability insurance for itself with respect to the Dominica Aerial Tram (*see id.* Ex. M), HAL is without any information concerning the level of insurance obtained by True Worshippers, and this information is not in the record.  (*See* 3/18/13 Myers Decl. Ex. F at 5.)  HAL has stated that, based on the discovery it has

---

[5] RFT/Elite asserted in one of its briefs that "True Worshippers was not a subcontractor." (RFT Reply at 11.)  RFT/Elite, however, does not support this assertion with any citation to the record.  As indicated above, the factual record points exclusively in the opposite direction—that True Worshippers and/or Mr. Hill were acting as RFT/Elite's  subcontractor with respect to ground transportation on the day of Mrs. Perry's accident.  Accordingly, despite RFT/Elite's unsupported assertion in its reply memorandum, there is no genuine issue of fact with regard to True Worshippers' and/or Mr. Hill's status as RFT/Elite's subcontractor.

ORDER - 14

1    received to date, Mr. Hill did not have "the equivalent of USD 2,000,000 in liability

2    coverage for his van used in transporting Mrs. Perry on the Doninica Aerial Tram

3    excursion" (*id.* Ex. F at 59).  Mr. Perry has asserted that Mr. Hill has liability insurance of

4    "only about $200,000 Dominican . . . (approximately $80,000 USD)."  (Plt. Mot. at 6.)[6]

5           In addition to the above provisions, TOPPS also recites that an "Operator is an

6    independent contractor and not an agent, partner, or joint venture of HAL," and that

7    "HAL acts as an independent contractor for purposes of selling Tours to its passengers."

8    (12/17/12 Myers Decl. Ex. 3 at 28; 1/18/13 McFetridge Decl. Ex. B at 27.)  TOPPS also

9    states that it "shall be governed by and construed in accordance with the law of the State

10   of Washington, U.S.A.," and that "[n]either party may assign or delegate, by operation of

11   law or otherwise, any of its rights, liabilities, duties or obligations under this Agreement

12   without the express written consent of a duly authorized officer of the other party."  (*Id.*)

13         **C.      The Cruise Contract**

14         After the Perrys purchased tickets for HAL's 2012 "Grand World Tour," HAL

15   sent them a copy of the "Cruise Contract."  (3/18/13 Perry Decl. ¶ 1; Arundell Decl. ¶ 3.)

16   On the first page, the contract states: "ISSUED SUBJECT TO TERMS AND

17   CONDITIONS ON THIS PAGE AND THE FOLLOWING PAGES.  READ TERMS

18   AND CONDITIONS CAREFULLY."  (3/18/13 Myers Decl. ¶ 3, Ex. A at 2.)  The

19   second page also states:  "NOTICE:  YOUR ATTENTION IS ESPECIALLY

20

21          _____

          [6] Mr. Perry provides no evidence to support this fact other than a bald statement in his
22   motion.  (*See* Plt. Mot. at 6.)  Defendants have not, however, disputed it.  In any event, the court
     does not rely upon this fact in its resolution of the present motions.

ORDER - 15

DIRECTED TO CLAUSES A.1, A.3, A.4, A.5, A.6, A.7, A.9 AND C.4 BELOW, WHICH CONTAIN IMPORTANT LIMITATIONS OF YOUR RIGHT TO ASSERT CLAIMS AGAINST US AND CERTAIN THIRD PARTIES." (*Id.* at 3.)

The Cruise Contract defines "Cruise" or "Cruisetour" as "the specific cruise or cruisetour indicated in this document (Cruisetours are only offered by HAL) . . . and shall include periods during which you are embarking or disembarking the Ship or are on shore while the Ship is in port." (*Id.* at 6.)  In this instance, those terms would refer to the "Grand World Tour" purchased by the Perrys, which embarked from Fort Lauderdale, Florida on January 6, 2012, and was scheduled to debark at the same location on April 28, 2012.  (*See id.* at 2.)  The Cruise Contract defines "Land Trip," in pertinent part, as "a shore excursion you purchase during your Cruise or Cruisetour, on which you are traveling on one or more motorcoaches, dayboats and/or railcars *owned or operated by us*." (*Id.* at 7 (italics added).)  The contract also states that "as to Land Trips, each Company furnishing a portion of the Land Trip agrees to provide you with that portion . . . ." (*Id.* at 8.)

With respect to limitations on liability, section A.4(a) states, in relevant part:  "In the event you are injured . . . or die . . . or you sustain any other loss or damage whatsoever, we will not be liable to you unless the occurrence was due to our negligence or willful fault." (*Id.* at 10.)  Section A.4(c) also states, in pertinent part:

> We do not undertake to supervise, nor assume any liability in respect of, the acts or omissions of . . . any . . . third party providing services, all of whom are either independent contractors or employed by independent contractors, and work directly for the passenger when performing their services. *As to your Cruisetour and Land Trips, certain transportation may be provided*

1   *using equipment owned and operated by us.  All other transportation, shore*
2   *excursions, accommodations and services in the air and on shore (referred*
    *to as "Non-Provider Services") are performed by third parties who are*
3   *independent contractors, and not by us.  We neither supervise nor control*
    *the activities provided by Non-Provider Services and assume no liability*
4   *and make no representation either express or implied as to their suitability.*
    *By way of example only, Non-Provider Services include goods and*
5   *services provided by shore excursion and tour operators (other than us),*
    *helicopter operators, amusement park operators, dayboat operators and*
6   *motorcoach operators.  As a result, you are assuming the entire risk of*
    *utilizing Non-Provider Services subject only to whatever terms or*
7   *arrangements are made by you or on your behalf with the third party*
    *furnishing the Non-Provider Service. . . ."*

8   (*Id.* at 11 (italics added).)

9       Finally, the Cruise Contract also states in relevant part that "this contract shall be

10  governed by and construed in accordance with the general maritime law of the United

11  States; to the extent such maritime law is not applicable, it shall be governed by and

12  construed in accordance with the laws of the State of Washington (U.S.A.)."  (2/26/13

13  McFetridge Decl. Ex. C at 10.)

14      **D.   Dominica Aerial Tram Ticket/Warning**

15      As a part of its motion for summary judgment, HAL submits a declaration from

16  the Director of Holland America Line, Inc.'s Risk Management Department, Chris

17  Arundell.  (*See generally* Arundell Decl. (Dkt. # 62).)  Mr. Arundell testifies that he has

18  reviewed "a sample excursion ticket purchased in the normal course by individuals

19  participating in the Dominica Aerial Tram excursion owned and operated

20  by . . . RFT/Elite," and he also attaches what he describes as "a true and correct copy" of

21  a sample Dominica Aerial Tram ticket.  (*Id.* ¶ 1, Ex. 2.)  He further testifies that "[a]s a

22

ORDER - 17

1  part of her ticket for her Dominica Aerial Tram excursion, [Mrs. Perry], through language

2  printed in the excursion ticket, received the following notice:"

3  **CONDITIONS –**

4  Shore excursions are "Non-Provider Services" for purpose of your Cruise
   Contract.  This means that shore excursions are not owned or operated by

5  Holland America.  Refer to your Cruise Contract for a full statement of
   your rights and obligations as well as those of the Owner of the Ship,

6  Holland America Line Inc., and certain other persons and entities with
   respect to Non-Provider Services.  In particular, please note that you are

7  assuming the entire risk of utilizing Non-Provider Services subject only to
   whatever terms or arrangements are made by you or on your behalf with the

8  third party furnishing the Non-Provider Services.  Holland America does
   not assume liability for injuries or damages that occur during or as a result

9  of shore excursions. . . .

10  (*Id.* ¶ 15, Ex. 2 at 2.)[7]

11      Other than Mr. Arundell's declaration, there is no evidence that either of the Perrys

12  actually received a "ticket" for the Dominica Aerial Tram or the warning printed on the

13  sample ticket.  The court notes that RFT/Elite, which runs the Dominica Aerial Tram

14  excursion, offered no evidence with respect to any ticket or warning the Perrys may have

15  received related to the excursion.

16

17  ───────────────

18      [7] Mr. Arundell purports to quote the sample Dominica Aerial Tram ticket in his
    declaration.  (*See* Ardundell Decl. ¶ 15.)  However, when the quote inside Mr. Arundell's
    declaration is compared with the copy of the sample ticket he attaches as an exhibit, it is plain

19  that the quote within Mr. Arundell's declaration is inaccurate in significant ways.  For example,
    the first sentence of the sample ticket reads:  "Shore excursions are "Non-Provider Services" for

20  purposes of your Cruise Contract."  (*Id.* Ex. 2 at 3.)  The first sentence of the quote within Mr.
    Arundell's declaration, however, reads:  "Shore excursions are "Non-Holland America Line

21  Services" for purposes of your Cruise Contract."  (*Id.* ¶ 15.)  Indeed, every time the term "Non-
    Provider Services" is used in the sample ticket attached as an exhibit to Mr. Arundell's

22  declaration, he has replaced the term with "Non-Holland America Line Services" in the quote
    within his declaration.  (*Compare id.* ¶ 15 *with id.* Ex. 2 at 3.)

1    Further, based on Mr. Arundell's declaration, the court is concerned that Mr.

2    Arundell, as an employee of HAL, may not have the necessary foundation to testify

3    concerning tickets purchased in the normal course for an excursion owned and operated

4    by RFT/Elite.  Indeed, Mr. Arundell has testified that

5         RFT/Elite is an independently owned foreign company that operates
          excursions for multiple cruise lines.  Holland America Line Inc. and related
6         companies have no affiliation or ownership interest in RFT/Elite, and
          Holland America Line Inc. and related companies do not participate in or
7         exert control over RFT/Elite operations.   The Dominica Aerial Tram
          excursion is an optional, off-ship tour that passengers can purchase.  The
8         tour in not part of passengers' cruise vacation package, but is an extra tour
          offered, owned, and operated by independent third party tour operators.  No
9         HAL employees participated in the shore excursion at issue. . . .

10   (*Id.* ¶ 13; *see also* 3/14/13 Lynch Decl. (Dkt. # 64) ¶ 13 ("RFT/Elite is an independently

11   owned foreign company . . . .  Holland America Line and its related companies have no

12   affiliation or ownership interest in RFT/Elite, and Holland America does not participate

13   in or exert control over RFT/Elite's operations.").)  In addition, Mr. Arundell has testified

14   that "HAL does not control or participate in the management of the manner, method,

15   conduct and management by which RFT/Elite provides the various excursion tours."

16   (Arundell Decl. ¶ 17.)

17       Compounding the foundational issue with respect to Mr. Arundell's testimony, the

18   court notes that the exhibit attached to Mr. Arundell's declaration, which he describes as

19   a "sample excursion ticket" does not appear on its face to be a "true and correct" copy—

20   in contravention to Mr. Arundell's express testimony.  (*See id.* ¶ 1 (describing the

21   attached sample excursion ticket as "a true and correct copy").)  Rather, the ticket and the

22   warning quoted above appear to have been enlarged significantly prior to their attachment

ORDER - 19

1    to Mr. Arundell's declaration.  Indeed, the letters on the exhibit appear to have become

2    quite distorted due to this enlargement.[8]  (*See id.* Ex. 2.)

3                                    **III.   ANALYSIS**

4            **A.    Standards**

5            Summary judgment is appropriate if the evidence, when viewed in the light most

6    favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

7    any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

8    P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Torres v. City of Madera*,

9    648 F.3d 1119, 1123 (9th Cir. 2011) ("Summary judgment is appropriate only if, taking

10   the evidence and all reasonable inferences drawn therefrom in the light most favorable to

11   the non-moving party, there are no genuine issues of material fact and the moving party is

12   entitled to judgment as a matter of law.").  The moving party bears the initial burden of

13   showing that there is no genuine issue of material fact and that he or she is entitled to

14   prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  *Furnace v. Sullivan*, 705 F.3d 1021,

15   1026 (9th Cir. 2013).  If the moving party meets his or her burden, then the non-moving

16   party "must make a showing sufficient to establish a genuine dispute of material fact

17   regarding the existence of the essential elements of his case that he must prove at trial" in

18

19   ─────────────────────

20        [8] The court also notes other obvious errors in Mr. Arundell's declaration.  For example, in
     his declaration, Mr. Arundell purports to quote from paragraph A.4 of the Cruise Contract.  (*See*
21   Arundell Decl. ¶ 14.)  A comparison of the language "quoted" by Mr. Arundell and the copy of
     the Cruise Contract he attaches as Exhibit 1, however, reveals obvious errors.  (*Compare id.* ¶ 14
22   *with id.* Ex. 1 at 6.)  For example, Mr. Arundell's "quotation" refers to "HAL Land Trips" (*id.*
     ¶ 14), although the copy of the Cruise Contract Mr. Arundell attaches refers simply to "Land
     Trips" (*id*. Ex. 1 at 6).

1   order to withstand summary judgment.  *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th

2   Cir. 2007).

3       **B.     Is Elite Estopped from Denying that Mr. Hill Is Its Agent?**

4           Mr. Perry moves for a ruling on summary judgment that RFT/Elite is estopped

5   from denying that Mr. Hill was its agent for purposes of providing transportation to and

6   from the Dominica Aerial Tram on the day that the Perrys participated in it.  (Plf. Mot. at

7   9-11.)  Equitable estoppel is based on the principle that a party should be held to a

8   representation made or position assumed where inequitable consequences would

9   otherwise result to another party who has justifiably and in good faith relied thereon.

10  *Kramarevcky v. Dep't of Social & Health Servs.*, 863 P.2d 535, 538 (Wash. 1993) (citing

11  *Wilson v. Westinghouse Elec. Corp.*, 530 P.2d 298, 300 (Wash. 1975)).  The elements of

12  equitable estoppel are:  (1) a party's admission, statement or act inconsistent with its later

13  claim; (2) action by another party in reliance on the first party's act, statement or

14  admission; and (3) injury that would result to the relying party from allowing the first

15  party to contradict or repudiate the prior act, statement or admission.  *Kramarevcky*, 530

16  P.2d at 538.

17          Washington courts do not favor equitable estoppel, and a party asserting it must

18  prove each of its elements by clear, cogent, and convincing evidence.  *Id.* at 539; *Teller v.*

19  *APM Terminals Pac., Ltd.*, 142 P.3d 179, 187 (Wash. Ct. App. 2006).  Under this burden

20  of proof, the trier of fact must be convinced the fact in issue is "highly probable."

21

22

ORDER - 21

1   *Colonial Imports, Inc. v. Carlton Northwest, Inc.*, 853 P.2d 913, 918 (Wash. 1993)

2   (quoting *In re Sego*, 82 Wash.2d 736, 739, 513 P.2d 831, 833 (Wash. 1973)).[9]

3          The facts presently before the court do not demonstrate that Mr. Perry has

4   established equitable estoppel with the type of clear and convincing evidence that would

5   be necessary for the court to grant his motion.  Mr. Perry's testimony is clear:  He and his

6   wife "used the [2012 Grand World Tour] Brochure to identify interesting shore

7   excursions and reserved tickets for the Dominica Rain Forest Aerial Tram based on the

8   information in the Brochures and discussions during several telephone calls with Holland

9   America personnel."  (12/27/12 Perry Decl. ¶ 2; 3/18/13 Perry Decl. ¶ 2.)  Mr. Perry also

10  points to the statement in the 2012 Grand World Tour Brochure that "[y]our excursion

11  takes you by coach through the city of Roseau to Laudat, a village nestled more than

12  2,000 feet upon the mountains."  (3/18/13 Myers Decl. ¶ 4, Ex. B at 22; *see also id.* Ex. D

13  at 21.)  Mr. Perry implies that this statement lead him and his wife to believe that one

---

14

15          [9] Neither RFT/Elite nor Mr. Perry expressly discuss choice of law, but both implicitly
    assume that Washington law applies.  (*See* Plf. Mot. at 9-11 (citing exclusively Washington case

16  law); RFT Resp. at 12-16 (citing exclusively Washington law).)  A federal district court sitting in
    diversity must use the choice of law rules of its forum state to determine which state's
    substantive law to apply.  *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005).  Mr.

17  Perry has alleged diversity jurisdiction.  (*See* 2d Am. Compl. (Dkt. # 52) ¶ 2.1 ("This court has
    diversity jurisdiction pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds

18  the sum specified in § 1332, exclusive of interest and costs, and there is complete diversity
    between the plaintiff and all defendants, in that the plaintiff is a resident of Connecticut and each

19  defendant is a resident of, respectively, the State of Florida, the State of Washington, or a foreign
    state.").  Accordingly, this court applies Washington's choice of law rules in this matter.  "An

20  actual conflict between the law of Washington and law of another state must be shown to exist
    before Washington courts will engage in a conflict of law analysis."  *Burnside v. Simpson Paper*

21  *Co.*, 864 P.2d 937, 942 (Wash. 1994).  Because Washington is the forum state, its law is applied
    unless the interested party, in a timely manner, invokes foreign law.  *See id.*  No party has timely

22  invoked foreign law prior to the noting dates for these motions, and thus the court applies
    Washington law to this issue.

1   operator would be providing both the portion of the excursion involving the Aerial Tram

2   and the ground transportation to and from the Tram.  (*See* 3/18/13 Plf. Resp. (Dtk. # 65)

3   at 2-3.)

4          The evidence before the court, however, indicates that it was HAL who produced

5   the brochure and not RFT/Elite.  Indeed, the Perrys have acknowledged that the brochure

6   was "provided by Holland America."  *Id.*  At a minimum, therefore, Mr. Perry has failed

7   to establish the second element of equitable estoppel that he and his wife took action—

8   here, to participate in the Dominica Aerial Tram excursion—in reliance upon RFT/Elite's

9   act, statement or admission.  To the contrary, the evidence to date indicates that the

10   Perrys made their decision to participate in the Dominica Aerial Tram excursion based on

11   HAL's representations.  (*See* 12/27/12 Perry Decl. ¶ 2; 3/18/13 Perry Decl. ¶ 2.)

12          Mr. Perry, however, also argues that RFT/Elite had a duty under TOPPS to review

13   the statement in the shore excursion brochure concerning the Dominica Aerial Tram

14   excursion to ensure its accuracy and to inform HAL of any inaccuracies.  (*See* 12/27/12

15   Myers Decl. Ex. 3 at 7; 1/18/13 McFetridge Decl. Ex. B at 7 ("The Shore Excursion

16   Department [of HAL] must be notified immediately of any changes in itineraries or

17   schedules of the tours so that modifications are made to our tour descriptions on our

18   website and in future brochures.").)  Mr. Perry argues that RFT/Elite, therefore, was

19   under a duty to correct the impression left by the description in the brochure that the tram

20   and ground transportation portions of the excursion would be provided by the same

21   operator.  Although there is some evidence in the record that an employee of RFT/Elite

22   reviewed the description of the Dominica Aerial Tram excursion on HAL's website for

ORDER - 23

1    accuracy, there is no evidence that anyone from RFT/Elite reviewed the statement printed

2    in HAL's brochure (*see* 3/28/13 Myers Decl. Ex. C (Bratt Dep.) at 21-23), which is the

3    specific statement upon which Mr. Perry has testified he relied (12/27/12 Perry Decl. ¶ 2;

4    3/18/13 Perry Decl. ¶ 2).

5           Further, although information provided by RFT/Elite forms the basis of HAL's

6    description of the tour in its brochure, HAL sometimes modifies the descriptions

7    provided by the tour operators.  (*See* 3/28/13 Myers Decl. Ex. C (Bratt Dep.) at 21:20-

8    23.)  In fact, TOPPS reserves HAL's right to modify the descriptions of shore excursions

9    provided by Tour Operators "at any time."  (12/27/12 Myers Decl. Ex. 3 at 7; 1/18/13

10   McFetridge Decl. Ex. B at 7.)  Thus, to the extent that the description in HAL's shore

11   excursion brochure is inaccurate or misleading, the court cannot conclude, based on the

12   record before it, that any such inaccuracy is attributable to RFT/Elite such that RFT/Elite

13   should be estopped on this basis from denying that Mr. Hill is its agent.

14          Mr. Perry also asserts that RFT/Elite had a duty under TOPPS to inform HAL

15   regarding RFT/Elite's use of any subcontractors.  (12/27/12 Myers Decl. Ex. 3 at 26;

16   1/18/13 McFetridge Decl. Ex. B at 25 ("Should the Operator subcontract for services . . . ,

17   the Tour Operator must provide a list of its subcontractors and evidence of the

18   subcontractor's insurance . . . .").)  RFT/Elite's failure to provide this information to

19   HAL forms the basis of the Perrys' claim of estoppel by silence against RFT/Elite.  (*See*

20   3/18/13 Plf. Resp. at 16.)

21          Mr. Perry is correct that Washington recognizes estoppel by silence.  *Sorenson v.*

22   *Pyeatt*, 146 P.3d 1172, 1180 (Wash. 2006).  "However, an essential element of an

equitable estoppel claim is that the party asserting estoppel must show that the other's conduct induced him to believe in the existence of the state of facts and to act thereon to his prejudice." *Id.*; *Elmonte Inv. Co. v. Schafer Bros. Logging Co.*, 72 P.2d 311, 325 (Wash. 1937) ("It is essential to an equitable estoppel that the person asserting the estoppel shall have done . . . some act or changed his position in reliance upon the representations or conduct of the person sought to be estopped.") (italics omitted)).  Thus, to establish that they relied to their detriment on RFT/Elite's alleged silence with respect to Mr. Hill's status as a subcontractor, Mr. Perry must demonstrate by clear, cogent and convincing evidence that he and his wife purchased their tickets to the Dominica Aerial Tram based at least in part on RFT/Elite's silence with respect to Mr. Hill's status. Indeed, Mr. Perry must establish that it is "highly probable" that they relied on RFT/Elite's silence with respect to this fact in deciding to participate in the Dominica Aerial Tram.  *See Colonial Imports*, 853 P.2d at 918.

Here, Mr. Perry states that he relied upon statements in HAL's brochure and undisclosed statements with HAL employees in various telephone conversations in choosing to participate in the Dominica Aerial Tram.  (12/27/12 Perry Decl. ¶ 2; 3/18/13 Perry Decl. ¶ 2.)  He does not specifically state that he relied on the fact that Mr. Hill would be an agent of the tram operator in making this decision to choose the Dominica Aerial Tram excursion, but he does state that "[d]ue to [HAL's] representations in the Brochure . . . ," he and his wife "expected that any tour operator . . . would be thoroughly vetted by [HAL], adhere to [HAL's] quality and safety standards and carry adequate liability insurance for any damages we might sustain while on the excursion."  (*Id.* ¶ 3.)

1    Assuming that HAL's statements to Mr. Perry and his wife concerning safety and the

2    existence of adequate insurance were based at least in part on RFT/Elite's alleged silence

3    with respect to Mr. Hill's status as an independent contractor (and there is no evidence of

4    this), Mr. Perry's declaration may be some support for his position.  It is, however, not

5    sufficient to pass muster under the high evidentiary standard applicable here.  Based on

6    Mr. Perry's testimony, the court cannot say that he has established his reliance on

7    RFT/Elite's alleged silence with respect to Mr. Hill's status as its agent or independent

8    contractor by clear, cogent, and convincing evidence or that his reliance on RFT/Elite's

9    alleged silence is highly probable.  Accordingly, the court DENIES this portion of Mr.

10   Perry's motion for partial summary judgment.

11   **C.   Are the Perrys Third-Party Beneficiaries of TOPPS?**

12        Mr. Perry and RFT/Elite have each asked the court to rule on summary judgment

13   with respect to whether the Perrys are third-party beneficiaries of TOPPS.  (*See* Plt. Mot.

14   at 11-13; RFT Mot. at 22-24.)  Accordingly, the court will consider this aspect of both

15   motions simultaneously.  The question of whether a contract is made for the benefit of a

16   third person is a question of contract construction.  *Kim v. Moffett*, 234 P.3d 279, 284

17   (Wash. Ct. App. 2010).  Contract construction is always a question of law and is thus

18   amenable to summary judgment.  *Id.* at 283.[10]

19

20        [10]  TOPPS states that it "shall be governed by and construed in accordance with the law

21   of the State of Washington."  (12/17/12 Myers Decl. Ex. 3 at 28; 1/18/13 McFetridge Decl. Ex. B
     at 27.)  Thus, the court applies Washington law with respect to contractual construction issues

22   involving TOPPS.

1  A third-party beneficiary is one who, though not a party to the contract, will

2  receive direct benefits from the contract's performance. *Kim*, 234 P.3d at 284. In

3  determining whether third-party beneficiary status is created by a contract, the critical

4  question is whether the benefits to the third party flow directly from the contract or

5  whether they are merely incidental, indirect, or consequential. *Id.* In other words, "[i]t is

6  not sufficient that the performance of the promise may benefit a third person but that it

7  must have been entered into for his benefit or at least such benefit must be the direct

8  result of performance and so within the contemplation of the parties." *Id.* That is, both

9  contracting parties must intend that a third-party beneficiary contract be created.

10 *Postlewait Constr., Inc. v. Great Am. Ins. Cos.*, 720 P.2d 805, 806 (Wash. 1986).

11  The test of intent, however, has nothing to do with the parties' motive, purpose, or

12 desire. *Lonsdale v. Chesterfield*, 662 P.2d 385, 389 (Wash. 1983) (citing *Vikingstad v.*

13 *Baggott*, 282 P.2d 824, 826 (Wash. 1955)). Instead, the test for the parties' intent is

14 objective: "If the terms of the contract *necessarily require the promisor to confer a*

15 *benefit upon a third person*, then the contract, and hence the parties thereto, *contemplate*

16 *a benefit to the third person . . . .*" *Id.* (quoting *Vikingstad*, 282 P.2d at 825 (italics in

17 original)). Indeed, "[s]o long as the contract necessarily and directly benefits the third

18 person, it is immaterial that this protection was afforded . . . , not as an end in itself, but

19 for the sole purpose of securing to the promisee some consequent benefit or immunity."

20 *Id.* (quoting *Vikingstad*, 282 P.2d at 826). Thus, the court "may not examine the minds of

21 the parties, searching for evidence of their motives or desires," but rather "must look to

22

1    the terms of the contract to determine whether performance under the contract would

2    necessarily and directly benefit the petitioners." *See id.*[11]

3         RFT/Elite asserts that "[n]either HAL nor RFT/Elite intended at the time they

4    entered into the contract that RFT/Elite would assume a direct obligation to Mr. Perry.

5    (RFT Resp. at 9.)  The terms of TOPPS itself, which guide the court's decision here

6    concerning the parties' intent, are fatal to RFT/Elite's position.  Several general

7    provisions of TOPPS indicate that its requirements are intended to benefit HAL's guests

8    or passengers, such as the Perrys.  For example, in section 2 of TOPPS, entitled "Purpose

9    of this Manual," the contract states:  "This manual provides important information

10   regarding HAL's expectation of how our Tour Operators should conduct their shore

11   excursions for our guests."  (2/26/13 McFetridge Decl. Ex. B at 4.)  Section 2 also states

12   that "[b]y providing services for HAL and its guests, Tour Operators agree to all the

13   requirements and conditions contained in this manual which are applicable to them."

14   (*Id.*)  In section 6, entitled "Safety and Security," the contract states, "Tour Operators

15   providing tours for HAL must deliver a product that is both safe and secure for HAL's

16   guests."  (*Id.* at 13.)

17

18   _____

[11] RFT/Elite relies upon *Warner v. Design and Build Homes, Inc.*, 114 P.3d 664 (Wash.

19   Ct. App. 2005), as similar to Mr. Perry's assertion of a third-party claim.  (*See* 1/18/13 RFT
     Resp. at 10-11.)  In *Warner*, homeowners found structural defects and mold in their home.  The

20   court held that the homeowners were not third-party beneficiaries to the contract between the
     builder and the subcontractor who built their home.  However, the case is distinguishable

21   because "[i]n the construction context, the prevailing rule is that a property owner is generally
     not a third-party beneficiary of a contract between the general contractor and a subcontractor."

22   *Id.* at 670.  This presumption against third-party beneficiary status in the construction context
     does not apply here.

ORDER - 28

1    In the "Liability and Insurance" section, TOPPS states:  "The Tour Operator is

2 responsible for guests from the time that they board the transportation provided by the

3 Tour Operator at the start of the shore excursion until the guests are safely returned to the

4 ship at the end of the excursion."  (*Id.* at 22.)  The contract then provides that Tour

5 Operators, operating in the Caribbean where Dominica is located, must provide "US$2.0

6 million/accident or occurrence" of auto and general liability insurance.  (*Id.*)  TOPPS

7 also provides, "Should the Operator subcontract for services (such as . . .  tour buses . . .),

8 the Tour Operator must provide a list of its subcontractors and evidence of the

9 subcontractor's insurance," and "[t]he subcontractor's insurance must also meet the

10 above criteria."  (*Id.* at 24.)

11    Although these insurance and other provisions may provide some benefit to HAL,

12 the Perrys, as HAL's "guests" or passengers, are also intended beneficiaries of these

13 provisions.  It is immaterial that RFT/Elite agreed to provide "this protection . . . not as

14 an end in itself," nor as an act of altruism toward the Perrys or HAL's other guests, but

15 rather for the purpose of securing the contract from HAL.  *See Lonesdale*, 662 P.2d at

16 390; (*see* RFT Mot. at 23 ("RFT/Elite promised to maintain minimum insurance . . . .

17 HAL in turn promised to make RFT/Elite's shore excursion available to its cruise

18 passengers.").)  Notwithstanding this motivation, TOPPS necessarily required RFT/Elite

19 to confer a benefit upon the Perrys.  RFT/Elite could not fully perform its promises under

20 TOPPS without directly benefitting the Perrys by providing the required liability

21 insurance and insuring that its subcontractors did too.  Indeed, as Mr. Perry points out,

22 HAL has its own insurance and has disclaimed vicarious liability for the negligence of

1   third-party service providers.  (*See* 2/26/13 McFetridge Decl. Ex. C (Cruise Contract) at

2   39-40.)  Thus, the logical beneficiaries of the insurance requirements imposed by TOPPS

3   would be HAL's "guests" or passengers.  The Perrys were, therefore, intended third-party

4   beneficiaries of the performance due under TOPPS.[12]  Accordingly, the court GRANTS

5   this portion of Mr. Perry's motion for partial summary judgment and DENIES this

6   portion of RFT/Elite's motion.

7           **D.       Did RFT/Elite Breach TOPPS?**

8           Mr. Perry and RFT/Elite have each asked the court to rule on summary judgment

9   with respect to whether RFT/Elite breached TOPPS.  (*See* 1/25/13 Plf. Reply (Dkt. # 49)

10  at 7-10; RFT Mot. at 24-26.)  Accordingly, the court will consider this aspect of both

11  motions simultaneously.  Mr. Perry asserts that RFT/Elite breached TOPPS in at least

12  two ways.  First, Mr. Perry asserts that RFT/Elite was contractually responsible for Mrs.

13  Perry, as a guest of HAL, "from the time that [she] board[ed] the transportation provided

14  by the Tour Operator at the start of the shore excursion until . . . [she was] safely returned

15  to the ship at the end of the excursion" (2/26/13 McFetridge Decl. Ex. B (TOPPS) at 22),

16  and that RFT/Elite failed to safely return her to the ship.  Second, Mr. Perry asserts that

17

18          [12] RFT/Elite apparently asserts that a clause in TOPPS prohibiting assignment of the
    contract evinces the parties' intent not to provide any benefits to third-parties.  (*See* RFT Mot. at

19  4.)  The court, however, disagrees.  The clause is an anti-assignment provision—prohibiting any
    assignment of the rights or obligations under the contract without the "express written consent"

20  of the other party.  Assignments take place after contracts are created, whereas third-party
    beneficiaries are created at the time of contracting.  *See Warner*, 114 P.3d at 670 ("A third-party

21  beneficiary contract exists when the contracting parties, at the time they enter into the contract,
    intend that the promisor will assume a direct obligation to the claimed beneficiary.").  Further, if

22  the parties had intended to state that TOPPS should not be construed for the benefit of any third
    party, they could have simply included such a clause.  They did not.

ORDER - 30

RFT/Elite breached TOPPS by failing (1) to inform HAL that Mr. Hill and/or True

Worshippers was RFT/Elite's subcontractor with respect to the Dominica Aerial Tram

excursion, (2) to provide evidence to HAL of Mr. Hill's and/or True Worshippers'

insurance coverage, and (3) to ensure that Mr. Hill's and/or True Worshippers' insurance

coverage met the $2 million per accident or per occurrence limit required in TOPPS for

tour operators in the Caribbean.  RFT/Elite denies that it breached TOPPS in any of these

ways, and both sides assert that they are entitled to summary judgment on these issues.

### 1. Did RFT/Elite Breach TOPPS by Failing to Return Mrs. Perry Safely to the Ship?

Under TOPPS, RFT/Elite was contractually responsible for Mrs. Perry, as a guest

of HAL, "from the time that [she] board[ed] the transportation provided by the Tour

Operator at the start of the shore excursion until . . . [she was] safely returned to the ship

at the end of the excursion."  (*See* McFetridge Decl. Ex. B at 22.)  HAL has

acknowledged that, under TOPPS, RFT/Elite "was responsible for providing the ground

transportation for the Dominica Aerial Tram excursion."  (3/18/13 Myers Decl. Ex. F

(Resp. to RFAs) at 2.)  RFT/Elite has also acknowledged this responsibility.  (3/28/13

Myers Decl. Ex. 6 at 2 ("[RFT/]Elite was responsible for arranging for passengers to get

to and from the cruise ship and the tour facility.").)  Mr. Perry asserts that RFT/Elite

breached this provision of TOPPS because RFT/Elite did not "safely return[]" Ms. Perry

"to the ship," but rather dropped her off at the pier "a considerable distance from the

vessel gangway" (3/18/13 Perry Decl. ¶ 6) and then fatally struck her with the minibus

used in transporting her to and from the tram.  (*See* 3/18/13 Plf. Resp. (Dkt. # 65) at 14.)

1   RFT/Elite responds that it is "**undisputed** that Mrs. Perry was delivered safely

2   back to the . . . pier."  (RFT Reply (Dkt. # 72) at 7 (emphasis in original).)  RFT/Elite

3   points to testimony from HAL indicating that, once a tour operator returns guests to the

4   pier, the shore excursion is over, and it is the guest's responsibility to get from the pier to

5   the ship.  (*See* RFT Mot. at 25-26; 2/26/12 McFetridge Decl. ¶ 12, Ex. J (HAL Rule

6   30(b)(6) Dep.) at 11:14-12:9.)[13]  RFT/Elite asserts that if HAL is not contending that

7   RFT/Elite breached TOPPS, then the Perrys (even if they are third-party beneficiaries)

8   cannot contend that RFT/Elite breached TOPPS.  (*See* RFT Reply (Dkt. # 72) at 11.)

9       First, the fact that Mrs. Perry was returned to the pier does not necessarily resolve

10  whether Mrs. Perry was "safely returned to the ship" as required by the express language

11  of TOPPS.  (*See* McFetridge Decl. Ex. B (TOPPS) at 22.)  The court concludes that

12

13      [13] The pertinent portion of the transcript of HAL's Federal Rule of Civil Procedure
        30(b)(6) deponent, Ellen Lynch, is as follows:

14
15      A:  Coming back [from a shore excursion] generally the tour operator just brings
        the guests back.  We generally have somebody on the pier at the end of the day to
        welcome the guests back and just greet them.  And it's the responsibility of the

16      tour operator to let the person on the pier know—the person is one of the shore
        excursion staff—to let them know that all buses have returned.  But the
17      responsibility of getting the guests from the pier to the ship is the guest's
        responsibility.  We bring them to the point that the buses—The tour operator
18      brings them to the point that the buses let them off.

19      Q:  Why isn't it the same level of assistance from Holland America getting them
        back on the vessel that there is in terms of getting them our on the pier and then
20      onto the buses?

21      A:  Because essentially it's free time at that point.  They're given a time to be
        back on board the ship, whatever the all aboard time is.  What they do between
        the return of the tour and the all aboard is the guest's decision.

22  (2/26/12 McFetridge Decl. ¶ 12, Ex. J (HAL 30(b)(6) Dep.) at 11:14-12:9.)

1  whether the point at which Mr. Hill deposited the Perrys on the pier complies with the

2  requirement in TOPPS to return them "to the ship" is a question of fact reserved for the

3  jury.  Further, even if returning Mrs. Perry to the pier would fulfill RFT/Elite's

4  contractual obligation to return her "to the ship," the court concludes there is also a

5  factual issue regarding whether RFT/Elite fulfilled its contractual duty to return her

6  "safely" to the ship.  The jury should decide whether RFT/Elite fulfilled this contractual

7  obligation where, although Mrs. Perry appeared to have initially arrived at the pier safely,

8  the same entity or individual that RFT/Elite secured for her ground transportation ran

9  over her only minutes later and before she could reach the gangway of the ship.

10         Further, RFT/Elite's assertion of the law with respect to the rights of third-party

11  beneficiaries to enforce the contract is wrong.  As a third-party beneficiary of TOPPS,

12  Mr. Perry is entitled to enforce the contract to the same extent that it is enforceable by

13  HAL.  *See Kinne v. Lampson*, 364 P.2d 510, 512 (Wash. 1961); *Shaffer v.McFadden*, 104

14  P.3d 742, 745 (Wash. Ct. App. 2005) ("A third party beneficiary can enforce a contract

15  provision only to the extent that the parties to the contract can enforce it."); *Wolfe v.*

16  *Morgan*, 524 P.2d 927, 930 (Wash. Ct. App. 1974).  The fact that HAL may interpret the

17  TOPPS provision differently than Mr. Perry or choose for its own reasons not to enforce

18  the contract does not mean that Mr. Perry is barred from enforcing it on his own.  *See*

19  *Expeditors Int'l of Wash., Inc. v. Expeditors (Japan), Ltd.*, 224 F.R.D. 661, 664 (W.D.

20  Wash. 2004) ("It is true that in Washington, . . . third-party beneficiaries to a contract

21  may sue directly to enforce the contract.") (citing *Grand Lodge of the S.F.A. v. U.S. Fid.*

22  *& Guar. Co.*, 98 P.2d 971, 975 (Wash. 1940) (holding that a third party beneficiary to a

1  contract may bring an action for breach of such contract)).  Mr. Perry's rights in this

2  regard are subject only such defenses as EFT/Elite might hold against HAL, *see Kinne*,

3  364 P.2d at 512, but they are not subject to HAL's decision on whether to assert its own

4  claim for breach or not.

5        RFT/Elite also asserts that Mr. Perry provided deposition testimony that the ship's

6  gangway was "not very far" from where they were dropped off by Mr. Hill in

7  contravention to his declaration.  (RFT Reply (Dkt. # 72) at 7.)  However, Mr. Perry's

8  deposition testimony is more naturally interrupted to mean that he and Mrs. Perry had not

9  walked very far when the accident happened, rather than that the ship's gangway was not

10  far from where Mr. Hill deposited them on the pier:

11        Q:  . . . [F]rom the time that you get out of the bus onto the pier, where did
you walk to next?

12

13        A:  Well, we got out of the bus.  I looked around.  I thought that we were
going to be escorted by either somebody from the tram company or Holland
America.  There was nobody there.  So we walked forward toward the

14  gangway, not very far.

15                       **********

16        Q:  How many feet from the bus did you walk before heading toward the
gangway?

17

18        A:  Not many.

19  (3/21/13 McFetridge Decl. (Dkt. # 73) ¶ 3, Ex. A (Perry Dep.) at 47:20-48:1, 48:14-16.)

20  On summary judgment, the court is required to view the evidence and draw all reasonable

21  inferences in the light most favorable to the non-moving party.  *Furnace*, 705 F.3d at

22

1026.  Thus, the court is obligated to view this testimony, which RFT/Elite presents in

favor of its position on breach, in a light most favorable to Mr. Perry.

    RFT/Elite also asserts that its performance under the contract was complete

because "[i]t is **undisputed** that the Perrys had more than 20 minutes from the time they

were dropped off [at the pier] to do whatever or go wherever they wanted."  (RFT Reply

at 7 (emphasis in original).)  Yet, although Mr. Hill testified that he dropped the Perrys

off at the pier by at least 4:29 p.m. (*see* Hill Decl. ¶ 7), the court's review of the record

does not reveal undisputed testimony or evidence that the accident occurred twenty

minutes later.  RFT/Elite appears to base its assertion as to the timing of Ms. Perry's

accident on two skewed photographs of the cruise chip that Mr. Perry produced in

discovery which have a time stamp of 4:54 p.m.  (*See* 2/26/13 McFetridge Decl. Ex. F at

4-5.)  RFT/Elite implies that Mrs. Perry's accident occurred at the moment Mr. Perry

inadvertently snapped these photos.  (*See* RFT Reply at 7.)  The court, however, finds

nothing in the record that definitively ties these two photographs to the timing of Mrs.

Perry's accident.  Indeed, Mr. Perry just as easily could have inadvertently taken these

photographs after Mrs. Perry's accident.[14]  Thus, the court concludes that whether

RFT/Elite breached TOPPS by failing to "safely return[]" Ms. Perry "to the ship at the

end of the excursion" (McFetridge Decl. Ex. B (TOPPS) at 22) presents a factual issue

---

[14] RFT/Elite also asserts that Mr. Perry's photographs demonstrate his proximity to the ship.  (RFT Reply at 7.)  First, it is Ms. Perry's proximity to the ship that is at issue.  Second, the photographs depict a chain link fence between the photographer and ship and no visible means to access the ship through the chain fencing.  Thus, the photographs do not demonstrate how far the Perrys would be required to walk to access the ship through the chain fencing.

for trial, and the court declines to award summary judgment to either party with respect to this issue.  Accordingly, the court denies both parties' motions with respect to this issue.

**2.      Did RFT/Elite Breach TOPPS by Failing to Notify HAL of Its Subcontractor and Its Subcontractor's Insurance Coverage?**

As discussed above, TOPPS contains two main provisions that are pertinent to this lawsuit, both of which concern the type of insurance coverage that is required of Tour Operators in the Caribbean, such as RFT/Elite.  First, TOPPS requires Caribbean Tour Operators to obtain minimum limits of "US$2.0 million/accident or occurrence" in auto and general liability insurance.  (12/27/12 Myers Decl. Ex. 3 at 24; 1/18/13 McFetridge Decl. Ex. B at 23.)  Second, TOPPS requires that "[e]xcursions utilizing commercial buses, vans or motor coaches and which are subject to U.S. Department of Transportation regulations" obtain minimum limits of "US$2.0 million per accident or occurrence" in "commercial and/or Business Auto Liability" coverage for vehicles of "15 passengers or less."  (*Id.* Ex. B at 22.)

In addition, the last paragraph of Section 12 addresses the use of subcontractors by Tour Operators.  It provides:

> Should the Operator subcontract for services (such as aircraft, rail, tour buses or watercraft), the Tour Operator must provide a list of its subcontractors and evidence of the subcontractor's insurance.  The subcontractor's insurance must also meet the above criteria.

(12/27/12 Myers Decl. Ex. 3 at 26; 1/18/13 McFetridge Decl. Ex. B at 25.)[15]

---

[15] This portion of Section 12 is reinforced by a related provision in Section 4, which states:

1     Mr. Perry asserts that he is entitled to a summary judgment ruling that RFT/Elite

2  breached the foregoing provisions of TOPPS because there is no dispute that RFT/Elite

3  did not (1) disclose its use of Mr. Hill and/or True Worshippers as subcontractors for the

4  ground transportation associated with the Dominica Aerial Tram excursion or (2) verify

5  that Mr. Hill and/or True Worshippers carried the requisite auto and general liability

6  insurance limits mandated under TOPPS.  RFT/Elite has admitted that it was responsible

7  for providing the ground transportation portion of the Dominica Aerial Tram excursion.

8  (3/28/13 Myers Decl. Ex. 6 at 2.)  RFT/Elite has also admitted that it procured drivers

9  from True Worshippers, including Mr. Hill, to provide ground transportation with respect

10  to the January 9, 2012, excursion.  (*See* Joseph Decl. ¶ 3; Royer Decl. ¶¶ 2, 4-6.)

11  Although RFT/Elite asserts in one of its briefs that True Worshippers was not a

12  subcontractor, there is no support for this assertion in the record, and in fact all of the

13  evidence supports the opposite conclusion.  *See supra* § II.B. at 12-14 & n.5.

14     The following admissions or statements from HAL also support Mr. Perry's

15  position:

16

17

18

19     If the name listed in the TDF [Tour Data Form] is different from the name listed
       in Section 1 of the Procedures and Policies [the signature page of TOPPS] and on

20     the required insurance certificate, the Tour Operator must provide HAL with (1)
       evidence of insurance for the entity listed on the TDF and (2) documentation

21     regarding the business relationship between the Tour Operator and that entity.
       See Section 12 below for more information regarding insurance documentation.

22  (12/17/12 Myers Decl. Ex. 3 at 8; 1/18/13 McFetridge Decl. Ex. B at 7.)

ORDER - 37

- Under TOPPS, RFT/Elite "was responsible for providing the ground transportation for the Dominica Aerial Tram excursion" on the date of the accident (3/18/13 Myers Decl. Ex. F (Resp. to RFAs) at 2);

- Under TOPPS, RFT/Elite "was required to maintain at least USD 2,000,000 in auto and general liability coverage for ground transportation associated with the Dominica Aerial Tram excursion" on the date of the accident (*id.* at 3);

- RFT/Elite subcontracted for the ground transportation associated with the Dominica Aerial Tram (3/18/13 Myers Decl. Ex. J (HAL Rule 30(b)(6) Dep.) at 28:19-22);

- Under TOPPS, RFT/Elite was required to disclose to HAL "all subcontractor[s] used for excursion related services" (3/18/13 Myers Decl. Ex. F (Resp. to RFAs) at 3);

- RFT/Elite did not disclose Mr. Hill or True Worshippers as subcontractors for the Dominica Aerial Tram excursion (*id.* at 3-4);

- RFT/Elite "was required to assure that any subcontractor it used to provide excursion related services had in place the equivalent of USD 2,000,000 in auto and general liability coverage" (*id.* at 4);

- Based on discovery produced so far in this litigation, Mr. Hill did not have the equivalent of this coverage in place on the date of the accident (*id*); and

- HAL has no information concerning True Worshippers' liability insurance coverage or limits (*see id.* at 5).

ORDER - 38

1    In response, RFT/Elite points to deposition testimony from HAL's Federal Rule of

2    Civil Procedure 30(b)(6) deponent indicating that RFT/Elite had satisfied TOPPS's

3    insurance requirement:

> Q:  Do you know whether [RFT/]Elite . . . satisfied that requirement [for $2
> 4    million of general liability insurance] as it pertained to the tour the Perrys
> 5    went on?
>
> 6    A:  Yes, or we would not have worked with them.

7    (2/26/13 McFetridge Decl. ¶ 12, Ex. J at 29:17-20.)  The fact, however, that RFT/Elite

8    complied with the requirement in TOPPS to obtain $2 million in liability insurance with

9    respect to its own coverage does not mean that RFT/Elite complied with the additional

10    requirement in TOPPS to notify HAL with respect to any subcontractor it used and to

11    provide evidence of the subcontractor's equivalent auto and general liability insurance.

12    In a futile attempt to create a factual issue regarding its breach of these contract

13    provisions, RFT/Elite reads more into HAL's Rule 30(b)(6) deposition testimony than is

14    actually there.

15    In an effort to avoid the consequences of its failure to identify Mr. Hill and/or True

16    Worshippers as excursion subcontractors, RFT/Elite also offers a strained construction of

17    TOPPS.  RFT/Elite asserts that TOPPS does not specify the amount of insurance required

18    of excursion subcontractors, and that it was not require to ensure that its transportation

19    subcontractors had the equivalent of $2 million in auto or general liability insurance per

20    accident or occurrence:

21    Q:  . . . I'm asking on behalf of [RFT/]Elite –

22    A:  Oh, on behalf of [RFT/]Elite?

Q:  -- are they required to have two million dollars of insurance?

A:  Yes, correct.

Q:  Would you agree that the contract provisions with Holland America spell out the insurance that [RFT/]Elite is required to have?

A:  Yes.

Q:  Is it your understanding that a subcontractor used by [RFT/]Elite has to have the same level of insurance as the liability insurance carried by [RFT/]Elite?

A:  No.

Q:  It's not your understanding?

A:  No. It is not specified.

(*Id.* ¶ 10, Ex. H at 35:23-36:14.)  RFT/Elite takes the position that any buses or coaches used for transportation on shore excursions were only required to carry specific types and minimum limits of insurance coverage if those buses or coaches were subject to United States Department of Transportation ("DOT") regulations.  (*See* RFT Mot. at 25 (citing 2/26/13 McFetridge Decl. ¶ 4, Ex. B at 22); RFT Resp. at 11 (citing 1/18/13 McFetridge Decl. ¶ 3, Ex. B at 22).)  RFT/Elite asserts that because Mr. Hill and True Worshippers were not subject to DOT regulations, but rather to Dominica insurance requirements, the insurance provisions in Section 12 of TOPPS were entirely inapplicable to them.  (RFT Mot. at 25; RFT Resp. at 12.)

In interpreting written contracts, Washington courts adhere to certain principles: (1) the intent of the parties controls; (2) the court ascertains the intent from reading the contract as a whole; and (3) a court will not read an ambiguity into a contract that is

1    otherwise clear and unambiguous. *Dice v. City of Montesano*, 128 P.3d 1253, 1257

2    (Wash. Ct. App. 2006) (citing *Mayer v. Pierce Cnty. Med. Bureau, Inc*., 909 P.2d 1323,

3    1326 (Wash. Ct. App. 1995)).  Contract interpretation is a question of law if the

4    interpretation does not depend on the use of extrinsic evidence or only one reasonable

5    inference can be drawn from the extrinsic evidence. *Tanner Elec. Corp. v. Puget Sound*

6    *Power & Light Co.*, 911 P.2d 1301, 1310 (Wash. 1996).

7         If the meaning of a contract provision is uncertain or if it is capable of more than

8    one reasonable meaning, it is ambiguous, and summary judgment is inappropriate.

9    *Marshall v. Thurston Cnty.*, 267 P.3d 491, 494 (Wash. Ct. App. 2011); *Mayer*, 909 P.2d

10   at 1326; *Go2Net, Inc. v. CI Host, Inc.*, 60 P.3d 1245, 1251 (Wash. Ct. App. 2003).

11   Whether a contract provision is ambiguous, however, is a question of law.  *Paradise*

12   *Orchards General P'ship v. Fearing*, 94 P.3d 372, 377 (Wash. Ct. App. 2004).  A

13   contract provision is not ambiguous simply because the parties suggest opposing

14   meanings.  *Mayer*, 909 P.2d at 1326.  If a contract is unambiguous, summary judgment is

15   proper even if the parties dispute the legal effect of a certain provision because

16   interpretation of an unambiguous contract is a question of law.  *Id.*; *see also Dice*, 128

17   P.3d at 1257 ("A [contract] provision is not ambiguous simply because the parties

18   suggest opposing meanings.").

19        RFT/Elite asks the court to interpret TOPPS in an unreasonable manner.  TOPPS

20   expressly states that "Tour Operators must obtain the following types of insurance, as

21   applicable."  (2/26/13 McFetridge Decl. Ex. B at 22.)  The agreement then lists a variety

22   of types of coverage including Auto and General Liability, Business Auto Liability for

1  commercial vehicles, Watercraft Liability, Scuba Liability, and Aircraft Liability.  (*Id.* at

2  22-23.)  The court agrees with RFT/Elite that the insurance provision in TOPPS for

3  commercial vehicles subject to DOT regulations is inapplicable to either Mr. Hill or True

4  Worshippers.  (*See id.* at 22.)  The fact, however, that this particular provision is

5  inapplicable does not render all of the remaining insurance requirements in TOPPS

6  inapplicable as well.  Nothing in the agreement indicates that RFT/Elite's subcontractors

7  are not subject to the same insurance criteria for auto and general liability that otherwise

8  applies to RFT/Elite.

9       Having carefully reviewed the contract, the court concludes that the insurance and

10  subcontractor reporting requirements contained within Section 12 of TOPPS are

11  unambiguous.  HAL has stated unequivocally that RFT/Elite "was responsible for

12  providing the ground transportation for the Dominica Aerial Tram excursion" on the date

13  of the accident.  (3/18/13 Myers Decl. Ex. F (Resp. to RFAs) at 2.)  Indeed, RFT/Elite

14  has admitted as much.  (3/28/13 Myers Decl. Ex. 6 at 2 ("[RFT/]Elite was responsible for

15  arranging for passengers to get to and from the cruise ship and the tour facility.").)

16  Section 12 requires RFT/Elite to report any subcontractor it used with respect to the

17  excursion to HAL.  There is also no genuine factual dispute that RFT/Elite subcontracted

18  with Mr. Hill and/or True Worshippers to provide the ground transportation on the day of

19  Mrs. Perry's accident and that RFT/Elite did not report its use of either Mr. Hill or True

20  Worshippers to HAL until after Mrs. Perry's accident.  The failure of RFT/Elite to inform

21  HAL of its use of a subcontractor constitutes a breach of Section 12 of TOPPS.

22

1        In addition, Section 12 unambiguously requires RFT/Elite to provide HAL with

2  "evidence of the subcontractor's insurance" and to ensure that the subcontractor's

3  insurance "also meet[s] the above criteria." (12/27/12 Myers Decl. Ex. 3 at 26; 1/18/13

4  McFetridge Decl. Ex. B at 25.) The relevant "above criteria" includes obtaining

5  minimum limits of "US$2.0 million/accident or occurrence" in auto and general liability

6  insurance for Tour Operators in the Caribbean. (12/27/12 Myers Decl. Ex. 3 at 24;

7  1/18/13 McFetridge Decl. Ex. B at 22.) There is no dispute that RFT/Elite did not

8  provide evidence to HAL concerning either Mr. Hill's and or True Worshippers'

9  insurance. There is also no dispute that Mr. Hill does not possess coverage with the

10  required $2 million limits and that HAL has no information concerning True

11  Worshippers' insurance or insurance limits. These undisputed facts entitle Mr. Perry to

12  an order on summary judgment that RFT/Elite breached this provision of TOPPS.[16]

13  Accordingly, the court GRANTS this portion of Mr. Perry's motion and DENIES

14  RFT/Elite's motion in this respect.

15  //

16

17     [16] During oral argument, HAL's counsel asserted that HAL would have considered RFT/Elite to be in compliance with the foregoing insurance provisions of TOPPS if the

18  $2 million in auto and general liability coverage acquired by RFT/Elite also covered any liabilities on the part of Mr. Hill and/or True Worshippers in the event that Mr. Hill was involved

19  in an accident while he was providing ground transportation for the Dominica Aerial Tram excursion. The court notes, however, that RFT/Elite has never asserted that any liabilities with

20  respect to the provision of ground transportation services by Mr. Hill and/or True Worshippers were covered under RFT/Elite's insurance policy. Further, there is no evidence in the record to

21  support this assertion. The only evidence in the record of RFT/Elite's insurance policy is a certificate of liability insurance that HAL produced to Mr. Perry in discovery. (3/18/13 Myers

22  Decl. ¶ 15, Ex. M.) There is no mention of either Mr. Hill or True Worshippers in RFT/Elite's certificate of liability insurance. (*Id.*)

1        **E.      Did RFT/Elite Owe a Heightened Duty of Care as a Common Carrier?**

2        RFT/Elite seeks a ruling on summary judgment that it is not a common carrier

3    with respect to Mr. Perry's tort claims.[17]  (RFT Mot. at 13.)  A common carrier in

4    Washington is held to the highest degree of care for the safety of its passengers that is

5    reasonably compatible with the operation of its business.  *See Price v. Kitsap Transp.*,

6    886 P.2d 556, 561 (Wash. 1994) (citing *Benjamin v. Seattle*, 447 P.2d 172, 173 (Wash.

7    1968)).[18]  Ordinarily, common carrier status is determined by a three part test: "(1) the

8    carriage must be part of the business; (2) the carriage must be for hire or remuneration;

9    and (3) the carrier must represent to the general public that this service is a part of the

10   particular business in which he is engaged, and that he is willing to serve the public in

11   that business."  *McDonald v. Irby*, 445 P.2d 192, 195 (Wash. 1968).  Here, however, the

12   court need not analyze these factors.  Undisputed facts in the record establish that even if

13   RFT/Elite and/or Mr. Hill were common carriers with respect to the Perrys at the time

14

15

16   _____

17        [17] Throughout their briefing and oral arguments, the parties repeatedly confuse or blur the
     lines between the contractual and tort duties at issue here.  The two types of duties are separate
18   and should be analyzed distinctly.  *See Eastwood v. Horse Harbor Foundation, Inc.*, 241 P.3d
     1256, 1262 (Wash. 2010) ("An injury is remediable in tort if it traces back to the breach of a tort
19   duty arising independently of the terms of the contract.").  The court notes that no defendant has
     asserted that any of Mr. Perry's tort claims are barred by Washington's independent duty
     doctrine.  *See id.*

20        [18] Neither RFT/Elite nor Mr. Perry expressly discuss choice of law with respect to this
21   issue.  Both implicitly assume in their briefing that Washington law applies.  (*See* RFT Mot. at
     10-13 (citing Washington law); 3/18/13 Plf. Resp. at 9-14 (citing predominately Washington
22   law).)  Accordingly, this court applies Washington law.  *See supra* note 9.

ORDER - 44

1    Mr. Hill transported them to the pier, any such a relationship would have ended by the

2    time of the accident.[19]

3          Under Washington law, in the absence of any unusual inherent danger, defect, or

4    obstruction in the place of alighting, the carrier/passenger relationship ceases upon the

5    alighting passenger gaining a secure and maintainable footing upon the street. *Welsh v.*

6    *Spokane & I.E.R. Co.*, 157 P. 679, 680 (Wash. 1916); *Shelley v. United Air Lines, Inc.*,

7    925 P.2d 991, 992-93 (Wash. Ct. App. 1996) (citing *Torres v. Salty Sea Days, Inc.*, 676

8    P.2d 512, 517  (Wash. Ct. App. 1984)).  Both Mr. Hill and Mr. Perry agree that Mr. Hill

9    dropped the Perrys off on the ship-side of the pier and that Mr. Hill assisted Mrs. Perry

10   out of the minibus.  (Hill Decl. (Dkt. # 58) ¶ 7; 2/26/13 McFetridge Decl. ¶ 7, Ex. E

11   (Perry Dep.) at 45:2-18, 46:17-47:7; *see also* Joseph Decl. ¶ 4.)  After Mr. Hill assisted

12   Mrs. Perry out of the minibus, the Perrys began walking towards the cruise ship's

13   gangway.  (*Id.* at 47:20-48:6; *see* Joseph Decl. ¶ 4.)  They were laughing as they walked.

14   (*Id.*)

15         There is no evidence of any unusual inherent danger, defect, or obstruction on the

16   pier at the time of Mrs. Perry's accident.[20]  At most, Mr. Perry testifies that he and his

17

18   ─────────────────

19       [19] Usually, the court will determine whether the party in question is a common carrier as
     a matter of law.  *See id.* at 196; *see also* 6 Washington Practice: Washington Pattern Jury
     Instructions—Civil § 100.02, comment (6th ed. 2012) ("In the vast majority of cases, the court
20   will determine whether the party in question is a common carrier as a matter of law.").

21       [20] Mr. Perry asserts in his response to RFT/Elite's motion that "Mrs. Perry . . . had to
     walk back—across the pier and through vehicular traffic criss-crossing it, to reach the ship."
22   (3/18/13 Plf. Resp. (Dkt. # 65) at 13.)  Mr. Perry, however, cites no evidence to support this
     assertion, and the court could find none in the record.  Indeed, Mr. Perry testified that the

ORDER - 45

1    wife "were dropped off at the pier a considerable distance from the vessel gangway."

2    (12/27/12 Perry Decl. ¶ 5.)  The court could find no evidence establishing the relevant

3    distance between the point at which the Perrys were dropped off and the gangway with

4    any more precision than the testimony offered by Mr. Perry.[21]  The court determines that

5    this imprecise testimony alone does not establish an issue of fact concerning the existence

6    of an unusual inherent defect or danger in the Perrys' place of alighting.  In *Carter v.*

7    *Spokane United Railways*, 288 P. 247 (Wash. 1930), the Washington Supreme Court

8    found no inherent danger when a street car deposited a passenger "thirteen feet north of

9    the crosswalk and in the intersection" where he was then struck by an automobile.  *Id.* at

10   248.  In *Lindgren v. Puget Sound International Railway & Power Co.*, 253 P. 791 (Wash.

11   1927), the court likewise found no inherent danger when a street car deposited a

12   passenger "forty feet beyond the customary stopping place and into the intersection"

13   where he was also "immediately struck by an approaching automobile."  *Id.* at 793; *see*

14   *also Derouin v. Kenneth L. Kellar Truck Line, Inc.*, No. C08-1409-JCC, 2010 WL

15   417417 at * 3 (W.D. Wash. June 29, 2010) (holding that taxi driver's common carrier

16

---

17   minibus was on the ship-side of the pier.  (2/26/13 McFetridge Decl. ¶ 7, Ex. E (Perry Dep.) at
     46:17-47:7.)

18

19        [21]  In its motion for summary judgment, HAL asserts that the distance between where the
     accident occurred and docking area where the cruise ship was moored was "some 300 plus feet
     from the vessel's embarkation gangway."  (HAL Mot. at 5.)  In support of this factual assertion,

20   HAL cites a deposition in which a witness marked on an aerial map where the ship was moored,
     the position of the gangway, and the location of the accident.  (*See id.* at 5 (citing Shields Decl.

21   (Dkt. # 63) Ex. 1 (Beaudoin Dep.) at 12:19-16:13, 13:11-17, Ex. 1.)  However, the court finds
     nothing in the evidence cited which establishes the specific distance asserted by HAL.  Even
     assuming this distance is correct, however, the court's analysis would not change.

22

ORDER - 46

1  duty ended when the passenger safely alighted on a solid sidewalk near mall despite the

2  fact that she was struck by an armored vehicle in a loading zone shortly thereafter).  Like

3  the plaintiffs in *Carter* and *Lindgren*, Mr. Perry has failed to raise a genuine issue of

4  material fact for trial concerning any unusual inherent danger or defect in the area where

5  he and his wife were dropped off on the pier.

6          Further, there is no evidence RFT/Elite or True Worshippers exercised any control

7  over the area of the pier where the Perrys were dropped off.  *See Zorotovich v. Wash. Toll*

8  *Bridge Auth.*, 491 P.2d 1295, 1298 (Wash. 1971) (one factor to consider in determining

9  plaintiff's status as a passenger is whether place of departure from carrier's conveyance

10 was under the control of the carrier).  Indeed, the undisputed evidence is that the pier is

11 managed by the Dominica Air and Sea Ports Authority, and this entity decides where

12 passengers are dropped off on the pier.  (2/26/13 McFetridge Decl. Ex. I (Royer Dep.) at

13 30:16-22.)

14         In addition, there is no evidence that RFT/Elite, Mr. Hill, or True Worshippers had

15 any knowledge of any disability on Mrs. Perry's part that would require the driver to treat

16 her with greater care than the other passengers.  *See Walker v. King County Metro*, 109

17 P.3d 836, 838-39 (Wash. Ct. App. 2005) (indicating that where a passenger has "a

18 distinctive physical condition that should have made the driver perceive a risk that would

19 require treating her with greater care than other passengers," that condition gives rise to a

20 duty to protect the passenger against the particular threatened risk).  Although Mr. Perry

21 has testified that Mrs. Perry was a "very slow walker, due to compromised knees"

22 (3/18/13 Perry Decl. ¶ 7), there is no evidence that he informed RFT/Elite or the minibus

ORDER - 47

1   operator of this fact.  For this enhanced duty of care to apply, the carrier must have actual

2   notice of the passenger's condition.  Imputed or implied notice is insufficient.  *See Torres*

3   *v. Salty Sea Days, Inc.*, 676 P.2d 512, 517 (1984) (refusing to apply doctrine where

4   carrier had no notice of passenger's intoxication) (quoting *Welsh v. Spokane & I.E. R.R.*,

5   157 P. 679, 681 (Wash. 1916)); *see also Sullivan v. Seattle Electric Co.*, 51 Wash. 71, 78-

6   79, 97 P. 1109, 1112 (1908) (common carrier's duty is to render special assistance if

7   passenger's special need is actually known, but not to anticipate passenger's special

8   needs or wants).

9          Because there is undisputed evidence that the Perrys exited the minivan onto the

10  pier and began walking back to the gangway of the ship, the court concludes that Mrs.

11  Perry gained a secure and maintainable footing on the pier, and that any common carrier

12  relationship between her and the driver of the minivan would have ceased at this point in

13  time.  Indeed, there is no indication that either of the Perrys were in any distress or

14  unusual danger upon exiting the minivan as undisputed evidence indicates they were

15  laughing as they walked toward the gangway.  (*See* Joseph Decl. ¶ 4.)  Accordingly, any

16  duty as a common carrier on the part of the driver of the minivan or any alleged principle

17  of the driver ended at the time the Perrys alighted onto the pier.  Thus, the duty owed by

18  the driver at the time of Mrs. Perry's accident was one of ordinary care and not the

19  heightened duty of a common carrier.  The court, therefore, GRANTS RFT/Elite's

20

21

22

1    motion for summary judgment with respect to its status as a common carrier at the time

2    of Mrs. Perry's accident.[22]

3        **F.    Was Mr. Hill and/or True Worshippers RFT/Elite's Agent at the Time of the Accident?**

4        RFT/Elite asks the court for a ruling on summary judgment that neither Mr. Hill

5    nor True Worshippers were its agent at the time of Mrs. Perry's accident for purposes of

6    vicarious tort liability.[23]  (RFT Mot. at 18-19.)  Undisputed testimony establishes that Mr.

7    Hill had signed out at 4:29 p.m., had completed his assignment for RFT/Elite, and was

8    heading out in his minibus to a new taxi driving job at the time of Mrs. Perry's accident.

9    (*See* Hill Decl. ¶¶ 7-9; Joseph Decl. ¶ 4 ("Mr. Hill indicated that he had another driving

10   engagement and headed back to his minibus."); *id.* Ex. A (attaching copy of "sign-

11   in/sign-out card for January 9, 2012" indicating that Mr. Hill signed in at 12:27 and

12   signed out at 4:29).)  Thus, RFT/Elite asserts that even if Mr. Hill (or his employer True

13   Worshippers) was RFT/Elite's agent with respect to the ground transportation for the

14   Dominica Aerial Tram excursion, Mr. Hill was no longer acting as RFT/Elite's agent at

15   the time of Mrs. Perry's accident.  (*See* RFT Mot. at 19.)

16

17   _____

18       [22] As noted above, there is a distinction between analyzing RFT/Elite's contractual duties
     under TOPPS and analyzing its potential status as a common carrier or its alleged duties in tort.

19   *See supra* note 17.  Thus, although the line is often muddled by the parties, the court's analysis
     of RFT/Elite's status as a common carrier and any resulting tort duty that it may owe is distinct

20   from its analysis of any contractual duty that RFT/Elite may have had to return the Perrys
     "safely . . . to the ship at the end of the excursion." (*See* 2/26/13 McFetridge Decl. Ex. B at 22;

21   3/18/13 Myers Decl. Ex. E at 22; *see supra* § III.D.1.)

22       [23] Once again, neither Mr. Perry nor RFT/Elite discuss choice of law with respect to this
     issue.  Accordingly, the court applies Washington law.  *See supra* note 9.

1    RFT/Elite is correct.  Even assuming the Mr. Hill were RFT/Elite's employee,

2    RFT/Elite would be insulated from vicarious tort liability based on the undisputed facts

3    presented here.  Washington's "going and coming rule," which is "an outgrowth of the

4    *respondeat superior* principle," insulates an employer from liability for the negligent acts

5    of its agents who are either going to or coming from a job.  *Breedlove v. Stout*, 14 P.3d

6    897, 899 (Wash. Ct. App. 2001).   Under this principle, "a workman is not, under

7    ordinary circumstances, in the course of employment while going to or from his

8    employer's place of business."  *See id.*; *see also Balise v. Underwood*, 428 P.2d 573, 576

9    (Wash. 1967) ("As a general rule, an employee traveling from the place of work to his

10   home or other personal destination, after completing his day's work, cannot ordinarily be

11   regarded as acting in the scope of his employment so as to charge the employer for the

12   employee's negligence in the operation of the latter's own car."); *Kaye v. Lowe's HIW,*

13   *Inc.*, 242 P.3d 27, 34 (Wash. Ct. App. 2010) ("Washington's 'going and coming' doctrine

14   provides that an employee is not, under ordinary circumstances, acting within the scope

15   of employment when traveling to or from work, thus protecting employers from vicarious

16   liability in such circumstances.").

17        In *Breedlove,* an employee of a lumber company finished his shift, punched out at

18   the time-clock, and drove away from the premises.  14 P.3d at 898.  He then decided to

19   return to the mill to retrieve a lumber grading book he intended to study over the

20   Christmas holiday.  *Id.*  As he turned around, he struck a motorcyclist causing severe

21   personal injuries.  *Id.*  Despite his work-related reason for returning to the mill, the court

22   still concluded that the "going and coming" doctrine applied to preclude liability on the

1    part of the lumber company. *Id.* at 901. *Breedlove* compels the same result here. Mr.

2    Hill had signed off the job with respect to providing ground transportation for the

3    Dominica Aerial Tram excursion and was heading to a new job at the time of the

4    accident. Even if Mr. Hill were RFT/Elite's agent while he was providing the ground

5    transportation for the Dominica Aerial Tram, Washington's "going and coming" doctrine

6    would preclude vicarious liability on the part of RFT/Elite for any negligence on Mr.

7    Hill's part once he signed off RFT/Elite's job and was leaving to assume new

8    responsibilities on a different job. Accordingly, the court GRANTS the portion of

9    RFT/Elite's motion for summary judgment that neither Mr. Hill nor True Worshippers

10   were acting as RFT/Elite's agent at the time of Mrs. Perry's accident for purposes of

11   vicarious tort liabilty.

12        **G.      Did RFT/Elite Breach a Duty of Ordinary Care?**

13        RFT/Elite also asserts that it is entitled to summary judgment with respect to

14   whether it breached its duty of ordinary care to Mrs. Perry. (*See* RFT Mot. at 13-16.)

15   The remaining avenues of potential tort liability on the part of RFT/Elite include

16   negligent selection of the transportation service provided for the tour and negligent

17   failure to warn of unreasonably dangerous conditions on the pier or with respect to the

18   taxi drivers. The court concludes that summary judgment is appropriate with respect to

19   both avenues.[24]

20

21   _____

22        [24] Neither Mr. Perry nor RFT/Elite analyze choice of law with respect to this issue.
     Accordingly, the court applies Washington law. *See supra* note 9.

1    In order to establish that RFT/Elite had a duty to warn the Perrys about a

2    dangerous condition on the pier or with respect to the taxi drivers used in the tour, Mr.

3    Perry must first establish that RFT/Elite was aware of such a condition.  Knowledge by

4    the defendant of the dangerous condition is a prerequisite to any recovery by the plaintiff.

5    *Brant v. Market Basket Stores, Inc*., 433 P.2d 863, 866-67 (Wash. 1967).  Here, Mr. Perry

6    has presented no evidence of any knowledge, either actual or constructive, on the part of

7    RFT/Elite concerning any danger associated with True Worshippers' taxi drivers in

8    general, Mr. Hill specifically, or the pier where the accident occurred.

9    It is undisputed that RFT/Elite had no knowledge of any problem or danger

10   associated with the taxi drivers affiliated with True Worshippers.  (Royer Decl. ¶ 4 ("In

11   my experience, True Worshippers' drivers were experienced, polite, and customer-

12   service oriented.  I am not aware of any complaints.").)  Indeed, Mr. Hill provided

13   undisputed testimony that prior to his accident involving Mrs. Perry, he had never been

14   involved in an automobile accident.  (Hill Decl. ¶ 8.)  Further, there is no evidence that

15   RFT/Elite was aware of any danger associated with the pier at issue.  (*See* McFetridge

16   Decl. Ex. I (RFT/Elite Rule 30(b)(6) Dep.) at 34:21-35:8.)

17   Mr. Perry submits a document from the United States Department of State website

18   containing information pertaining to Dominica.  (3/28/13 Myers Decl. Ex. 4.)  Under the

19   heading of "Traffic Safety and Road Conditions," the document states that '[d]rivers

20   should be alert for minibus (taxi) drivers, who often make sudden stops or pull out into

21   traffic without warning or signaling."  (*Id.* at 5.)  The court agrees with RFT/Elite,

22   however, that such a generalized warning about traffic conditions throughout the country

ORDER - 52

1   cannot, as a matter of law, serve as "knowledge" sufficient to trigger RFT/Elite's duty to

2   warn with respect to any alleged traffic dangers on the pier at issue or with respect to the

3   specific minibus drivers hired by RFT/Elite.  *See, e.g.*, *Burdeaux v. Royal Caribbean*

4   *Cruises, Ltd.*, No. 11-22798-CIV, 2012 WL 3202948, at *5 (S.D. Fla. Aug. 2, 2012)

5   (State Department warnings concerning risk of sexual assault in city in general were

6   insufficient to place cruise company on notice of danger of sexual assault in specific

7   district where passengers were invited to shop) (citing *Koens v. Royal Caribbean Cruises,*

8   *Ltd*., 774 F. Supp. 2d 1215, 1219-20 (S.D. Fla. 2011) (dismissing claim because the

9   complaint failed to allege that the defendant knew or should have known of dangerous

10  conditions on either the tour at issue or the grounds where the tour took place, but rather

11  merely alleged a rising crime rate in the port city in general); *see also Reming v. Holland*

12  *Am. Line, Inc.*, No. C11-1609RSL, 2013 WL 594281, at *5 (W.D. Wash. Feb. 14, 2013)

13  (two newspaper articles about deterioration of Mazatlan's plazas were insufficient to

14  place HAL on actual or constructive notice of danger alleged with respect to specific

15  plaza where plaintiff fell into a sink hole).  Thus, the court GRANTS summary judgment

16  with respect to this portion of RFT/Elite's motion.

17        Drawing all inferences in favor of Mr. Perry, the court also concludes that there is

18  insufficient evidence to avoid summary judgment with respect to Mr. Perry's claim that

19  RFT/Elite was negligent in "provid[ing] competent, qualified and adequately trained

20  drivers for the bus tour segment of the Dominica Aerial Tram excursion."  (*See* 2d Am.

21  Compl. ¶ 4.17.)  In general, an employer of an independent contractor can be held liable

22  if the employer negligently selects the independent contractor.  *See Sea Farms, Inc. v.*

1  *Foster & Marshall Realty, Inc.*, 711 P.2d 1049, 1052 (Wash. Ct. App. 1985); *L.B. Foster*

2  *Co. v. Hurnblad*, 418 F.2d 727, 729 n.2 (9th Cir. 1969) (applying Washington law).

3  Nevertheless, RFT/Elite cannot be held liable under this theory unless Mr. Hill and/or

4  True Worshippers lacked competence in providing the necessary transportation and

5  RFT/Elite knew or should have known of this deficiency.  *Id.* at 730; *see also Remming*,

6  2013 WL 594281 at *6.

7       As RFT/Elite asserts there is no evidence, prior to the accident at issue here, that

8  either True Worshippers or Mr. Hill lacked competence with respect to the minibus

9  transportation service at issue here.  Mr. Hill had never been involved in an accident prior

10  to his accident involving Mrs. Perry.  (Hill Decl. ¶ 8.)  In addition, Nikima Royer, who

11  worked for Defendant Rain Forest Aerial Tram, Ltd., and oversaw procurement of

12  transportation for tour participants to and from the cruise dock to the tour facility, was

13  unaware of any complaints associated with True Worshippers and viewed True

14  Worshippers' drivers as "experienced, polite, and customer-service oriented."  (Royer

15  Decl ¶¶ 2, 4.)  She also testified that RFT/Elite used three government certified taxi

16  associations, and that all of these associations, including True Worshippers, require their

17  drivers to be trained, experienced, licensed, and insured.  (*Id.* ¶ 4.)  All taxi drivers must

18  have a license from the national authorizing body.  (2/26/13 McFetridge Decl. Ex. I

19  (Royer Dep.) at 33:5-6.)  RFT/Elite requires all of their transportation service providers

20  to have the national license.  (*Id.* at  33:13-15.)  All certified taxi drivers must go through

21  a government-authorized training program and possess insurance and are not permitted

22

1  into the port security area unless they produce a government-issued certification.  (*Id.* at

2  333:6-8; Royer Decl. ¶ 4.)

3       In response, Mr. Perry points to no evidence that either Mr. Hill or True

4  Worshippers lacked competence in providing transportation services as described herein

5  prior to the date of the accident or that RFT/Elite had knowledge of any such deficiency.

6  Indeed, Mr. Perry fails to address this issue at all in his responsive memorandum.  (*See*

7  *generally* 3/18/13 Plf. Resp.)  Accordingly, the court GRANTS RFT/Elite's motion for

8  summary judgment with respect to this aspect of Mr. Perry's negligence claim.

9       **H.      Was There a Joint Venture Between RFT/Elite and HAL?**

10      Mr. Perry asserts that RFT/Elite and HAL are joint venturers, and that

11  consequently they are liable for each other's negligence.  (2d Am. Comp. ¶¶ 4.25-4.30.)

12  Both RFT/Elite and HAL move for dismissal of this claim and basis for vicarious liability

13  on summary judgment.  (*See* RFT Mot. at 19-22; HAL Mot. at 8-10.)  Accordingly, the

14  court addresses this aspect of their two motions simultaneously. [25]

15      A joint venture is similar to a partnership but is limited to a particular transaction

16  or project.  *Pietz v. Indermuehle*, 949 P.2d 449, 453 (Wash. Ct. App. 1998).  As a result

17

---

18      [25] Once again, none of the parties discussed choice of law with respect to this issue.  Both
HAL and RFT/Elite cite a mixture of Washington and federal cases.  (*See* HAL Mot. at 8-10;

19  RFT Mot. at 19-22.)  However, because the allegation of a joint venture involves HAL, federal
maritime rather than Washington law may apply.  General maritime law, however, recognizes

20  joint venture liability, *Haas v. 653 Leasing Co.*, 425 F. Supp. 1305, 1315 (E.D. Pa. 19977),
"under essentially the same conditions which give rise to such liability under the common law of

21  several states."  *Itel Containers Int'l Corp. v. Atlantrafik Express Serv. Ltd.*, No. 86 CIV. 1313
(RLC), 1988 WL 75262, at *3 (S.D.N.Y. July 13, 1988). Therefore, irrespective of whether the

22  court applies Washington or general maritime law, the court's outcome with respect to this issue
remains unchanged.

1  of the voluntary relationship that arises between joint venturers, joint venture members

2  are liable for each other's torts. *Adams v. Johnston*, 860 P.2d 423, 430 (Wash. Ct. App.

3  1993).  Joint ventures are not created by operation of law, but arise by express or implied

4  contract.  *Paulson v. Pierce Cnty.*, 664 P.2d 1202, 1208 (Wash. 1983).  Under

5  Washington law, the elements of a joint venture are: "(1) an express or implied contract,

6  (2) a common purpose, (3) a community of interest, and (4) an equal right to a voice,

7  accompanied by an equal right to control."  *Id.*; *see also Adams*, 860 P.2d at 430 ("Other

8  indicia of a joint venture include the right to share in profits, a duty to share in losses, and

9  a joint proprietary interest in the subject matter.").

10       With respect to element three, "community of interest," each joint venturer must

11  share equally in profits and losses.  *See Refrigeration Eng'g Co. v. McKay*, 486 P.2d 304,

12  311 (Wash. Ct. App. 1971).  The absence of a mutual interest in profits "has been held to

13  be conclusive evidence that a joint venture does not exist."  *Id.* at 312.  With regard to

14  element four, "one has an equal right to a voice" in the joint venture when he or she "has

15  an equal right in management and conduct of the undertaking," and when members

16  "equally govern upon the subject of how, when, and where the agreement shall be

17  performed."  *Carboneau v. Peterson*, 95 P.2d 1043, 1055 (Wash. 1939).  Nevertheless,

18  the key element is an express or implied contract between the parties.  *Id.* at 1054 ("The

19  sine qua non of the relationship is a contract, whether it be express or implied.").

20       TOPPS unambiguously states that RFT/Elite "is an independent contractor and not

21  an agent, partner or joint venturer of HAL."  (2/26/13 McFetridge Decl. Ex. B at 26.)

22  Further, HAL has provided evidence that it has no affiliation or ownership interest in

1  RFT/Elite or control over RFT/Elite's management, assets, finances, or excursion

2  operations.  (3/14/13 Arundell Decl. (Dkt. # 62) ¶ 13, 17.)  In addition, although HAL

3  receives some compensation for selling tour tickets related to RFT/Elite's excursion tours

4  in Dominica based on gross sale price of the tickets, HAL does not share in the profits or

5  losses generated in relation to any tour offered by RFT/Elite.  (*Id.* ¶ 16.)  Mr. Perry has

6  offered no response or opposition to this evidence.  (*See generally* 3/18/13 Plf. Resp.; *see*

7  *also* 3/28/13 Plf. Resp. at 2 (indicating Mr. Perry is not pursuing his claim based on a

8  joint venture against HAL).)  Under these circumstances, summary judgment dismissing

9  Mr. Perry's claims based on the operation of a joint venture between HAL and RFT/Elite

10  is appropriate.  *See Reming*, 2013 WL 594281, at *6 (granting summary judgment under

11  similar circumstances with respect to an injured cruise passenger's claim of joint venture

12  between HAL and a tour operator).  Accordingly, the court GRANTS this portion of both

13  HAL's and RFT/Elite's motions for summary judgment.

14      **I.**    **Are Mr. Perry's Damages Compensable under the Washington CPA?**

15      HAL argues that Mr. Perry's CPA claim must fail as a matter of law because

16  personal injury claims are not cognizable under the CPA.  (HAL Mot. at 11.)  HAL is

17  correct that Mr. Perry may not recover under the CPA for any of his or his wife's

18  personal injuries as a result of her accident.  In a citizen-initiated CPA claim, the plaintiff

19  must prove five elements:  "(1) unfair or deceptive act or practice; (2) occurring in trade

20  or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or

21  property; (5) causation."  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,

22  719 P.2d 531, 533 (Wash. 1986).  Although the injury involved need not be great, the

1   fourth element of a CPA claim requires an injury to business or property.  *Ambach v.*

2   *French*, 216 P.3d 405, 407 (Wash. 2009).  Personal injuries do not satisfy the injury

3   requirement and are not compensable under the CPA.  *Id.* at 408.

4          Mr. Perry agrees with HAL that any personal injuries he has alleged in this lawsuit

5   are not recoverable under the CPA.  (3/28/13 Plf. Resp. (Dkt. # 75) at 11 ("Mr. Perry

6   agrees with Holland America.  Personal injury claims by themselves do not implicate the

7   CPA.").)  Nevertheless, Mr. Perry asserts that damages associated with the cost of his and

8   his wife's purchase of both the cruise and shore excursion tour tickets do fall within the

9   purview of the CPA.  (*Id.*)  Mr. Perry is correct.  A recent decision of the Washington

10  Court of Appeals is on point.  In *Smith v. Stockdale*, 271 P.3d 917 (Wash. Ct. App. 2012),

11  a plaintiff brought an action against a property owner alleging that the property owner

12  had violated the CPA by deceptively charging the plaintiff a $5.00 fee to access adjacent

13  property for the purpose of cliff jumping.  After paying the $5.00 fee, the plaintiff jumped

14  from a cliff on the adjacent property into a river and suffered back and other personal

15  injuries.  *Id.* at 920-21.  The trial court granted summary judgment to the property owner

16  with respect to the plaintiff's CPA claim.  *Id.* at 921.  On appeal, the fourth element of the

17  plaintiff's CPA claim, "injury to plaintiff in his or her business or property," was at issue.

18  *Id.* at 922.  Like Mr. Perry, the plaintiff argued that her recovery under the CPA did not

19  arise from her personal injury, but instead from an injury to her property.  *Id.*  She

20  contended that the she was injured in her property when the property owner charged her

21  $5.00 to jump from the cliff.  *Id.*  The court agreed, stating:  "Because [the plaintiff's]

22  injury is limited to the entry fee, she meets the fourth element of her CPA claim."  *Id.*

1    Like the plaintiff in *Smith*, Mr. Perry has expressly limited his damages under his

2    CPA claim to the purchase price of his and wife's cruise and shore excursion tickets.

3    (*See* 3/28/13 Plf. Resp. at 11.)  On this basis, Mr. Perry's CPA claim may go forward.

4    Accordingly, the court grants in part and denies in part HAL's motion for summary

5    judgment with respect to this issue.  The court dismisses on summary judgment any claim

6    for personal injuries under Mr. Perry's CPA claim because such damages do not

7    constitute injury in business or property.  However, Mr. Perry's claim for the cost of his

8    and wife's cruise and shore excursion tickets cannot be dismissed on this basis.

9    Accordingly, this aspect of Mr. Perry's CPA claim survives.

10        **J.      Are HAL's Statements Regarding Passenger Safety in Shore
              Excursions Actionable as Negligent Misrepresentations?**

11        Mr. Perry has alleged that, in choosing to participate in the Dominica Aerial Tram

12    excursion, he and his wife relied upon a variety of statements in HAL's shore excursion

13    brochure, on its website, and in conversations with HAL employees.  (*See* 2d Am.

14    Compl. ¶¶ 4.31-4.38; 12/27/12 Perry Decl. ¶¶ 2-3; 3/18/13 Perry Decl. ¶¶ 2, 4.)  Mr.

15    Perry has asserted a claim for misleading advertising or negligent misrepresentation

16    against HAL based on some of these statements and Mr. Perry's and his wife's alleged

17    reliance upon them.  (*See* 2d Am. Compl. ¶¶ 4.31-4.38; *see also* 2/28/13 Plf. Resp. (Dkt.

18    # 75) at 13-15.)[26]  In its motion, HAL asks the court to rule on summary judgment that

19

20    _____

21        [26] In his second amended complaint, Mr. Perry styles his cause of action as one for
      "Misleading Advertising."  (2d Am. Compl. at 17.)  However, in his responsive memorandum,
22    he cites the elements of negligent misrepresentation as applicable to his claim.  (3/28/13 Plf.
      Resp. at 13.)

1  general statements contained in its brochure regarding the safety of shore excursions

2  cannot form the basis for a negligent misrepresentation claim.  (HAL Mot. at 11-14.)

3      Initially, the court clarifies the standard under which it considers this portion of

4  HAL's motion.  HAL argues that because a claim for misleading advertising sounds in

5  fraud and must be pled with particularity, *see* Fed. R. Civ. P. 9(b), Mr. Perry's claims on

6  summary judgment are limited to the two specific misrepresentations (attributed to HAL)

7  that Mr. Perry alleges in his complaint.  (*See* HAL Mot. at 12.)  HAL is incorrect in this

8  regard and confuses summary judgment, which has the potential to dismiss a claim with

9  prejudice, with a motion to dismiss for failure to state a claim, which may allow a

10  plaintiff to amend the pleading.  *See Bass v. Ameriquest Mortg. Co.*, No. 09-00476

11  JMS/BMK, 2010 WL 3025167, at *8 (D. Haw. Aug. 3, 2010).  At issue on summary

12  judgment is whether the evidence presented establishes a genuine issue of material fact

13  supporting the plaintiff's claims, and not whether the plaintiff has sufficiently pleaded the

14  claims.  *See Cable & Computer Tech., Inc. v. Lockheed Sanders, Inc.*, 214 F.3d 1030,

15  1038 (9th Cir. 2000) (reversing the district court's grant of summary judgment where it

16  appeared that the court "inappropriately applied Fed. R. Civ. P. 9(b), requiring

17  particularity in the pleading of fraud, to a summary judgment motion where evidence, not

18  pleading, was to be considered."); *see also Hawkins-El v. First Am. Funding, LLC*, 891 F.

19  Supp. 2d 402, 413 (E.D.N.Y. 2012) ("[O]n summary judgment, courts have excused

20  parties' failures to satisfy Rule 9(b) when other evidence in the record adduced through

21  discovery demonstrates that the plaintiff would be able to replead with the requisite

22  specificity.").  Accordingly, at this juncture, the court considers the evidence in the

ORDER - 60

1    record in light of the standard applicable to motions for summary judgment, and not the

2    standard on a motion to dismiss.

3           The evidence, pleadings, and briefing before the court indicate that Mr. Perry is

4    asserting several bases for his negligent misrepresentation against HAL.  As HAL notes,

5    Mr. Perry is arguing that HAL's statements in its shore excursion brochure concerning

6    the general safety of the shore excursions were misleading.  (*See* 2d Am. Compl. ¶¶ 4.31-

7    4.37.)  Mr. Perry, however, has not limited his negligent misrepresentation claim to

8    HAL's statements concerning safety.  For example, Mr. Perry is also asserting that

9    statements in HAL's brochure were misleading with respect to who or what entity would

10   be providing the ground transportation associated with the Dominica Aerial Tram and

11   who or what entity would be conducting the Dominica Aerial Tram excursion itself.  (*See*

12   3/28/13 Plf. Resp. at 14-15; *see also* 2d Am. Compl. ¶¶ 3.3-3.12, 3.14, 4.1-4.13 (referring

13   repeatedly to "HAL-sponsored shore excursions").)  As noted above, HAL's brochure

14   repeatedly refers to the shore excursions described therein using possessive terms such as

15   "our tours" or "our tour operators."  (3/18/13 Myers Decl. Ex. D. at 23; 12/27/12 Myers

16   Decl. Exs. 1, 2.)  The brochure asks passengers to consider booking tours "with Holland

17   America" as opposed to making independent arrangements.  (*Id.*)  Indeed, Mr. Perry

18   testified that he was under the impression that the excursion was operated by HAL and

19   that the driver, Mr. Hill, worked for HAL.[27]  (*See* 3/28/13 Myers Decl. Ex. 3 at 13:4-

20

21           [27] HAL has asserted that the content of its representations within the Cruise Contract
     concerning its relationship with shore excursion and tour operators is not in dispute.  (*See* HAL
22   Reply (Dkt. # 78) at 3).  HAL further asserts that through these representations, it "informed the

14:23; 2/26/13 McFetridge Decl. Ex. E at 43:4-6.)  In any event, HAL has only moved

for summary judgment with respect to the aspect of Mr. Perry's claim concerning HAL's

statements regarding the general safety of the shore excursions.  (*See* HAL Mot. at 11-

Perrys that the transportation provided in connection with their shore excursion was provided by non-HAL, independent third parties; and that [the Perrys] assumed the entire risk of utilizing this third party transportation."  (*Id.* at 6.)  The court, however, cannot conclude that the Cruise Contract is unambiguous with respect to whether HAL or a third party would be operating the shore excursion or providing the associated ground transportation.  For example, the Cruise Contract defines "Land Trip," in part, as "a shore excursion you purchase during your Cruise or Cruisetour, on which you are traveling on one or more motorcoaches . . . *owned or operated by us.*"  (3/18/12 Myers Decl. Ex. A at 7 (italics added).)  The Cruise Contract also states:  "As to your Cruisetour and Land Trips, *certain transportation will be provided using equipment owned or operated by us.*  All other transportation, shore excursion, accommodations and services in the air and on shore (referred to as "Non-Provider Services") are performed by third parties who are independent contractors, and not by us."  (*Id.* at 11 (italics added).)  The court finds that this contract language is ambiguous with respect to whether the particular shore excursion at issue falls within the clause pertaining to Land Trips with "motorcoaches . . . owned or operated by us [HAL]" and "certain transportation . . . operated by us [HAL]" on the one hand, or within the clause pertaining to "third parties who are independent contractors" and for whom HAL disclaims liability on the other hand.  This is so particularly under the facts of this case where HAL blurs the distinction between excursions operated by HAL (*i.e.*, HAL Land Trips) and excursions operated by third parties by referring to third-party excursions as "our tours" and third-party tour operators as "our tour operators," along with other statements, in its promotional materials.  (*See, e.g.*, 12/27/12 Myers Decl. Exs. 1, 2.)

　　　HAL asserts that the ticket issued for the Dominica Aerial Tram provided notice that the excursion was operated by a third-party contractor for whom HAL disclaimed any liability.  (*See* Arundell Decl. ¶ 1, Ex. 2.)  However, as the court discussed above, there are serious evidentiary issues with respect to Mr. Arundell's declaration which prevent the entry of summary judgment on the basis of this portion of his testimony or statements on the Dominica Aerial Tram ticket to which he refers.  *See supra* § II.D.  Specifically, HAL's apparent distortion of the ticket prevents the court from applying the Ninth Circuit's two prong "reasonable communicativeness" test to determine when the passenger of a common carrier is contractually bound by the fine print of his or her ticket.  *See Wallis v. Princess Cruises*, 306 F.3d 827, 835 (9th Cir. 2002).  Under this test, the court first considers the physical characteristics of the ticket, including print size, the conspicuousness and clarity of the notice, and the ease with which a passenger can read the provisions in question, and then considers the particular circumstances, unique in each case, surrounding the purchase and retention of the ticket or contract.  *Id.* at 835-36.  HAL's distortion of the exhibit comprising a copy of a sample Dominica Aerial Tram excursion ticket prevents the court from engaging in the first prong of this test.

14.)  Accordingly, the court rules only with respect to this narrow portion of Mr. Perry's negligent misrepresentation claim.

Mr. Perry has not provided any evidence to suggest the falsity of HAL's general statements concerning the safety of shore excursions or, more specifically, the Dominica Aerial Tram excursion, or that HAL knew or should have known that the Dominica Aerial Tram was unsafe prior to Mrs. Perry's accident.  *See Wolff v. HAL Lines, Inc*., No. 09-50RAJ, 2010 WL 234772, at *2 (W.D. Wash. 2010).  In at least ten years of operations prior to Mrs. Perry's accident, HAL had never received a complaint regarding any safety concern, danger, or accident involving the Dominica Aerial Tram excursion. (3/14/13 Lynch Decl. ¶¶ 18, 23-25.)  The fact that Mrs. Perry was injured while participating in the excursion is insufficient to establish that HAL should have known beforehand that the excursion was not safe.  *See Reming*, 2013 WL 594281, at *7.  "A general promise that the trip will be safe and reliable does not constitute a guarantee that no harm will befall plaintiff."  *Id.* (quoting *Isbell v. Carnival Corp.*, 462 F. Supp. 2d 1232, 1237 (S.D. Fla. 2006) (internal quotations and alterations omitted)).  Unfortunately, accidents can and do occur even under safe conditions or during safe activities.  Because Mr. Perry has failed to put forward any evidence to support his negligent misrepresentation claim with respect to HAL's general statements concerning the safety of its shore excursions or the Dominica Aerial Tram excursion, HAL is entitled to summary judgment on this portion of Mr. Perry's negligent misrepresentation claim.  As noted above, other aspects of Mr. Perry's negligent misrepresentation claim remain for trial.

1    **K.     Was HAL Negligent?**

2          HAL asserts that Mr. Perry's claims for negligence falls within three categories:

3    (1) whether HAL was negligent in the selection or retention of RFT/Elite (HAL Mot. at

4    15-16), (2) whether HAL was negligent in selecting the pier at issue or failing to warn

5    with respect to pedestrian or traffic hazards (*id.* at 17-22), and (3) whether HAL was

6    directly negligent with respect to the conduct on the dock of its agents or employees with

7    respect to the events surrounding Mrs. Perry's accident (*id.* at 22-23).  Mr. Perry does not

8    dispute this categorization, and indeed acknowledges that he is not pursuing claims

9    against HAL with respect to the second category.  (3/28/13 Plf. Resp. (Dtk. # 75) at 2

10   ("Mr. Perry has not responded to [HAL]'s briefing concerning congestion and traffic

11   flow at the pier . . . because he is not pursuing those claims.").)  The court, therefore,

12   addresses only categories one and three.

13         Preliminarily, the court notes that maritime law applies with respect to Mr. Perry's

14   claims of negligence against HAL.  "It is a settled principle of maritime law that a

15   shipowner owes the duty of exercising reasonable care towards those lawfully aboard the

16   vessel who are not members of the crew."  *Reming*, 2013 WL 594281, at *3 (quoting

17   *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959)).  Several

18   courts have applied this standard to negligence claims related to injuries that have

19   occurred on a variety of cruise ship excursions.  *Id.* (citing *Samuels v. Holland American*

20   *Line–USA, Inc.*, 656 F.3d 948, 953 (9th Cir. 2011) (applying standard to claims related to

21   injuries sustained while swimming in Pacific Ocean during excursion); *Balaschak v.*

22   *Royal Caribbean Cruises, Ltd*., No. 09-21196-CIV, 2009 WL 8659594, at *3-5 (S.D. Fla.

1    Sept. 14, 2009) (applying standard to negligence claims related to injuries from car

2    accident during an excursion); *Isbell v. Carnival Corp.*, 462 F. Supp. 2d 1232, 1237 (S.D.

3    Fla. 2006) (applying standard to claims related to injuries sustained during excursion in

4    rainforest)). The Court finds that the reasonable care standard pronounced in *Kermarec*

5    applies to Mr. Perry's negligence claims against HAL.

6    **1.      Was HAL Negligent in Selecting, Supervising or Retaining RFT/Elite?**

7            Mr. Perry contends that HAL was negligent in its supervision and retention of

8    RFT/Elite—particularly in its failure to ensure that RFT/Elite was reporting use of any

9    third-party contractors (such as Mr. Hill or True Worshippers) and in ensuring that any

10   such subcontractors were competent and had adequate liability insurance.  HAL cannot

11   be found liable under this theory unless RFT/Elite lacked competence in providing shore

12   tours and HAL knew or had reason to know of this deficiency on the part of RFT/Elite.

13   *See Reming*, 2013 WL 594281, at *6.  In short, the relevant inquiry is whether HAL

14   diligently inquired into RFT/Elite's fitness and competence before employing the

15   company as a tour operator and thereafter.  *See id.*

16           As noted above, in at least ten years of operations prior to Mrs. Perry's accident,

17   HAL had never received a complaint regarding any safety concern, danger, or accident

18   involving the Dominica Aerial Tram excursion.  (3/14/13 Lynch Decl. ¶¶ 18, 23-25.)

19   Further, HAL has specific procedures in place with respect to the selection, review

20   (including of safety concerns), and retention of shore excursion operators.  (*See, e.g.*,

21   3/14/13 Lynch Decl. ¶¶ 6-7, 11, 16, 21.)  Based on the foregoing, HAL asserts that it had

22

1    no reason to suspect any deficiency with respect to RFT/Elite's operations prior to Mrs.

2    Perry's accident, and it is therefore entitled to summary judgment on this issue.

3          The court agrees with HAL's position as far as it goes.  HAL cannot be held liable

4    on the basis that it knew or had reason to know that RFT/Elite was operating unsafely

5    prior to Mrs. Perry's accident and failed to take action that could have averted her injury.

6    Mr. Perry's argument, however, is slightly different.  He asserts that HAL had a duty in

7    tort to ensure that RFT/Elite was complying with TOPPS by notifying HAL of any

8    subcontractors that RFT/Elite utilized with respect to the Dominica Aerial Tram and by

9    ensuring that any such subcontractors held the contractually required insurance limits and

10   that they were otherwise competent.  (*See* 3.28.13 Plf. Resp. at 15.)  Mr. Perry asserts that

11   HAL also acknowledged this duty in its brochure when it stated that it had "take[n] steps

12   to identify and contract with reputable tour operators," who "must comply with local

13   government requirements and carry liability insurance in amounts consistent with local

14   standards to address personal injury and property damage."  (12/27/12 Myers Decl. Ex. 2

15   at 3; *see* 3/28/13 Plf. Resp. at 16 ("This question [of HAL's negligence] has to be

16   answered against the backdrop of what [HAL] did both at the corporate level and on the

17   pier to ensure that ground transportation providers met the high and objective standards

18   established by [HAL] in the Brochure and TOPPs agreement.").)

19         Mr. Perry repeatedly states in his responsive memorandum that there is evidence

20   to support this theory, but he provides no specific citations to the record.  (*See id.* at 16.)

21   Indeed, the record indicates that HAL was unaware of RFT/Elite's use of True

22   Worshippers or Mr. Hill as subcontractors until after Mrs. Perry's accident.  (*See* 3/18/13

ORDER - 66

Myers Decl. ¶ 12, Ex. J at 28.)  Nevertheless, the court acknowledges that there is

evidence in the record that HAL personnel were on the pier both to assist passengers as

they disembarked and to help them locate the appropriate ground transportation for their

land excursions, as well as to greet them upon their return to the ship.  (2/26/13

McFetridge Decl. Ex. J (HAL Rule 30(b)(6) Dep.) at 11:3-12:23.)  There is also

testimony that, although Dominca taxi associations usually do not mark their buses,

Dominica taxi drivers typically wear a uniform of the company for whom they work.

(3/18/12 Myers Decl. Ex. H (Royer Dep.) at 28:19-29-9.)  Further, there is testimony that

taxi drivers wore these uniforms specifically when providing transportation for the

Dominica Aerial Tram.  (*Id.* at 29:6-9.)

Thus, Mr. Perry's question is:  Did HAL breach a duty of ordinary care when its

personnel allegedly saw this red flag with respect to the mini-bus drivers' uniforms or

some other indication that RFT/Elite was utilizing an undisclosed subcontractor and

failed to follow up to ensure that the ground transportation subcontractor was properly

insured?  The court concludes that the evidence described above is minimally sufficient

for Mr. Perry to survive summary judgment with respect to this narrow question of

HAL's alleged negligence.  Accordingly, HAL's motion for summary judgment

requesting dismissal of Mr. Perry's claim for negligence is granted, except for the narrow

issue described above.

### 2.    Was HAL Directly Negligent with Respect to Mrs. Perry's Accident?

Mr. Perry does not argue that HAL's employees were directly negligent with

respect to Mrs. Perry's accident or were somehow directly involved in the accident itself.

1  (*See generally* 3/28/13 Plf. Resp.)  Further, he has dropped his claims regarding traffic or

2  pedestrian hazards on the pier and HAL's alleged failure to provide adequate warnings.

3  (*See id.* at 2, 17.)  Thus, HAL is entitled to summary judgment with respect to these

4  aspects of Mr. Perry's negligence claim as well.[28]

5              **IV.    CONCLUSION**

6          Based on the foregoing, the court GRANTS in part and DENIES in part Mr.

7  Perry's motion for partial summary judgment (Dkt. # 37), GRANTS in part and DENIES

8  //

9  //

10 //

11

12 [28] The court notes that there is evidence in the record that could support a theory of
vicarious tort liability against HAL based on apparent authority—in particular, HAL's brochure

13 repeatedly refers to shore excursions using possessive terms such as "our tours" or "our tour
operators."  (3/18/13 Myers Decl. Ex. D. at 23; 12/27/12 Myers Decl. Exs. 1, 2.)  In addition,
TOPPS requires that tour operator promotional materials "reflect HAL's name only."  (12/27/12

14 Myers Decl. Ex. 3 at 9.)  The common law of agency applies to admiralty cases.  *West India
Indus., Inc. v. Vance & Sons AMC-Jeep*, 671 F.2d 1384, 1387 (5th Cir. 1972); *Overseas*

15 *Carriers, Inc. v. Team Ocean Services-Dallas, Inc.*, No. H-10-2842, 2013 WL 76300, at *11
(S.D. Tex. Jan. 4. 2013).  Although there is some dispute whether implied agency applies in the

16 context of torts in Washington, *see Dubret v. Holland America Line Westours, Inc.*, 25 F. Supp.
2d 1151, 1153 (W.D. Wash. 1998), the Restatement (Third) of Agency specifically allows that

17 "[a] principal is subject to vicarious liability for a tort committed by an agent in dealing or
communicating with a third party on or purportedly on behalf of the principal when actions taken
by the agent with apparent authority constitute the tort . . . ."  RESTATEMENT (THIRD)

18 AGENCY § 7.08 (2006); *see, e.g.*, *Doonan v. Carnival Corporation*, 404 F. Supp. 2d 1367, 1372
(S.D. Fla. 2005) (holding that the court was unwilling to conclude that there were no conceivable

19 facts under which the plaintiff could demonstrate an apparent agency claim against cruise line).
Nevertheless, no party has moved for summary judgment with respect to the issue of HAL's

20 liability under a theory of apparent authority.  This may be because the issue of apparent
authority is generally one of fact for the jury.  *See NLRB v. Donkin's Inn, Inc.*, 532 F.2d 138, 140

21 (9th Cir. 1976).  Accordingly, the issue remains for trial assuming that Mr. Perry is inclined to
pursue it.

22

1   in part RFT/Elite's motion for summary judgment (Dkt. # 56), and GRANTS in part and

2   DENIES in part HAL's motion for summary judgment (Dkt. # 61).

3          Dated this 14th day of May, 2013.

4

5

6          _____

7          JAMES L. ROBART
           United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 69